WILLIAM WHALEN

*v.*

THOMAS C. STEPHENS *et al.*

*Opinion filed October 24, 1901—Rehearing denied December 11, 1901.*

1. APPEALS AND ERRORS—*when error cannot be assigned on admission of evidence.* Error cannot be assigned on the admission of evidence at the hearing before the master where no objection was made when the evidence was given, and the objections to the master's report, which were ordered to stand as exceptions, contain nothing relating to the admission or exclusion of evidence.

2. SAME—*when party waives right to insist that evidence was incompetent.* The right to insist that conversations had prior to the execution of a written contract were improperly admitted is waived, where the party against whom they were admitted, on being examined by his own solicitor, gave his version of the conversations and materially contradicted the other evidence relating thereto.

3. CONTRACTS—*courts will seek to ascertain and give effect to the intention of the parties.* Courts will seek to discover and give effect to the intention of the parties to a written contract, so that performance may be enforced according to the sense in which they mutually understood the contract when it was made.

4. SAME—*courts will look to the practical construction of a contract by the parties.* In seeking to ascertain the intention of the parties to a written contract, regard will be had to any practical construction which the parties, by their acts, have put upon it.

5. EQUITY—*when equity will dissolve a partnership.* A court of equity will dissolve a partnership when the disagreements and disputes between the parties have become so violent and lasting as to prevent any beneficial results from the continuance of the relation.

*Whalen v. Stephens*, 92 Ill. App. 235, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. CHARLES G. NEELY, Judge, presiding.

In deciding this case the Appellate Court made the following statement of facts:

"January 10, 1899, Thomas C. Stephens, appellee, filed a bill against appellant, William Whalen, and appellee Charles Lay and Albert W. Barnum, for an accounting

and dissolution of partnership between Stephens, Lay and Whalen. The bill alleges that the following was the agreement of partnership:

" 'This agreement, made this 12th day of August, 1897, witnesseth: That, whereas, William Whalen, of Eureka, Eureka county, Nevada, has this day sold, for the consideration hereinafter expressed, to the co-partnership hereinafter described, consisting of William Whalen, of Eureka, Eureka county, Nevada, Charles Lay, of Chicago, Illinois, and Thomas C. Stephens, of Chicago, Cook county, Illinois, for their joint interest, all his, the said William Whalen's, holdings of stock in the St. Peter's Consolidated Gold and Silver Mining Company, a corporation organized and existing under and by virtue of the laws of the State of Illinois, the following co-partnership is formed.

" 'The said William Whalen, Charles Lay and Thomas C. Stephens have this day entered into articles of equal co-partnership for the following purposes, viz.: to take the necessary steps to revive and re-establish the Whalen Consolidated Copper Mining Company, a corporation existing under and by virtue of the laws of the State of Illinois, and to re-open and renew operations upon what are known as the Whalen mines, located in the Antelope mining district, in Eureka county, Nevada, and to proceed at once with the work and development of the said mines, and such other joint enterprises as they may mutually agree upon.

" 'It is further agreed that the said co-partners shall combine and consolidate their several interests into one interest, and that no one individual interest shall be voted, disposed of or transferred without consent and co-operation of the other two interested. All expenses connected with the work and business aforesaid shall be borne equally among the partners, and the said partners hereby mutually covenant and agree to and with each other, that during the continuance of the said co-part-

nership neither of them shall or will endorse any note, draft, bond or obligation, or otherwise become surety for any person or persons whomsoever, without the consent of the other partners; and at the end or other sooner termination of their co-partnership the said co-partners, each to the other, shall and will make a true, just and final account of all things relating to their said business, and in all things truly adjust the same; and all and every the stock and stocks, and increase thereof, which shall appear to be remaining either in money, goods, stocks, wares, merchandise, fixtures, debts or otherwise, shall be divided between them, share and share alike.

"'It is further agreed by and between the said partners that there shall be had and kept, at all times during the continuance of their co-partnership, perfect, just and true books of account, wherein each of the said co-partners shall enter and set down as well all moneys by them or either of them received, paid, laid out and expended in and about the said business, and also all goods, wares, stocks, commodities and merchandise by them, or either of them, bought or sold by reason of or on account of the said mining business, and all matters and things whatsoever to said business and the management thereof in anywise belonging, which said books shall be used in common between said co-partners, so that each of said co-partners may have access thereto without any interruption or hindrance of the others; and also that the said co-partners, once in each month during the continuance of their co-partnership, on or before the 15th day of each month, or oftener, if deemed expedient, shall make, yield and render, each to the other, a true, just and perfect account of all profits and increase or loss by them, or either of them, acquired or sustained; and all gains, profits and increase that shall come, grow or arise from or by means and out of their said joint business shall be divided between them, share and share alike, and all loss that shall happen to their joint business by ill-commodities,

bad debts, or otherwise, shall be borne and paid between them equally, and that such profits and losses shall be divided between them once in each month, or oftener, as shall be mutually agreed between them.

" 'The consideration for the transfer by the said William Whalen to the said co-partnership aforesaid is the advancement by the said co-partnership to said Whalen of all necessary moneys to defray the expenses of said Whalen in and about his contemplated trip to Eureka, Eureka county, Nevada, including his transportation and living expenses to Eureka and return; and as a further consideration for the transfer and sale of the stock holdings of the said Whalen to the co-partnership aforesaid, said co-partners, and each of them, hereby agree to advance such other money as may be necessary to defray the expenses of reasonable attorney's fees in and about procuring certain books and papers belonging to the St. Peter's Consolidated Gold and Silver Mining Company, and the arranging and calling of necessary stockholders' and directors' meetings for the purpose of reviving and re-organizing the said Whalen Consolidated Copper Mining Company.

" 'As a further consideration for the transfer of stock by the said Whalen to the co-partnership aforesaid, each of the said co-partners agrees to engage his best services and endeavors in and about promoting and advancing the interests of the said Whalen and of the Whalen Consolidated Copper Mining Company, devoting such time, labor and attention as may be for the best interests of the said Whalen and of the co-partnership aforesaid.

" 'It is further agreed that the said private stock holdings of the said William Whalen this day transferred, as aforesaid, shall remain in escrow with Albert W. Barnum, at 1009 Chicago Stock Exchange Building, in Chicago, Cook county, Illinois, to be voted as a unit at such times as each of said co-partners shall mutually agree among themselves, and that no part of said stock shall be voted

or disposed of by one partner without the full consent of the other partners.

"'It is further agreed that the said William Whalen shall have the exclusive management of said mines, and full control of all labor and employees hereafter to be employed.

"'It is further agreed that no salaries shall be paid to any of the partners herein named, or to any officers or agents hereafter to be elected, until the mines and mining property aforesaid are producing an income over and above all expenses, and among such expenses shall be included the obligations and contracts hereafter to be made by the said Whalen for labor claims and the costs of material, all of which said obligations shall be paid by the said co-partners, all such payments to be reimbursed out of the general fund of the Whalen Consolidated Copper Mining Company when re-established.

"'It is further understood and agreed that no part of said stock purchased by this co-partnership from the said William Whalen shall be sold for less than $25 per share, but each partner shall do all in his power to make sale of the stock of said company.

"'This co-partnership shall exist until such time as the partners shall mutually agree to dissolve, and shall be known as Lay, Stephens & Whalen.

"'It is further mutually agreed that no partner shall enter into any individual speculation or speculative business whatsoever without the consent of his partners.

"'All checks and drafts upon the general fund of the Whalen Consolidated Copper Mining Company, or of the co-partnership, shall be signed by one of said partners and countersigned by the other two.

Witness:                          WILLIAM WHALEN,
  WILLIAM H. GRUVER,              CHARLES LAY,
  ROBERT HUMPHREY.'               THOMAS C. STEPHENS.

"It is further alleged, in substance, that the parties to the agreement entered upon the performance of their

duties under it, and that the complainant has performed all the duties devolving on him; that complainant and Lay caused the necessary steps to be taken to revive and re-establish the Whalen Consolidated Copper Mining Company, (hereafter called the Whalen company,) and to develop said mines, and to that end expended a large sum of money and devoted much time; that the private stock of Whalen, which the agreement provided should be and remain with Barnum, were Whalen's stock holdings in the Whalen company and in the St. Peter's Consolidated Gold and Silver Mining Company, (hereafter called the St. Peter's company); that at the date of the agreement the St. Peter's company owned all the capital stock of the Whalen company, and that said partners so arranged that the greater part of said stock was assigned by the St. Peter's company to Whalen, and 79,980 shares of the said stock became and was the stock referred to in the partnership agreement. The Whalen company is an Illinois corporation, with a capital stock of $2,500,000, divided into 100,000 shares of the par value of $25 each. Pursuant to the partnership agreement a board of directors of the Whalen company was elected, and said directors served until their successors were elected. At a regular annual meeting of stockholders of said company held January 12, 1898, the same directors were re-elected for another year, since which time various changes in the directory have been made. The next regular annual meeting of stockholders will occur Wednesday, January 11, 1899, at eleven o'clock A. M. Large funds of the complainant and of the partnership have been expended in promoting and developing the business of the Whalen company. Pursuant to the partnership agreement there was issued by the Whalen company to complainant, Whalen and Lay, partners as aforesaid, a certificate numbered 1084, for 78,981 shares of the stock of said corporation, which stock was partnership property. February 10, 1898, while complainant was absent from the city of

Chicago on partnership business, Whalen and Lay, without complainant's knowledge or consent, made the following agreement:

" 'This agreement, made this 10th day of February, 1898, by and between William Whalen and Charles Lay, two of the partners of Lay, Stephens & Whalen, which partnership was formed by an agreement dated August 12, 1897:

" ' *Witnesseth:*  That in the absence of Thomas C. Stephens in Boston, certain matters have been presented which show it to be for the best interest of the partnership of Lay, Stephens & Whalen that certificate 1084 of the stock of the Whalen Consolidated Copper Mining Company shall be canceled, said certificate being for 78,981 shares; also, that other certificates belonging to said firm shall all be canceled and one certificate issued to William Whalen for 82,115 shares, being certificate No. 1136, to be held by him, the said William Whalen, for the present, being all the time the property of the said Lay, Stephens & Whalen.

" 'Witness our hands and seals as above set forth, February 10, 1898.

WILLIAM WHALEN,     (Seal.)
CHARLES LAY.          (Seal.)'

"Thereupon Lay and Whalen, without complainant's knowledge or consent, canceled, so far as they were able to do so, said certificate for 78,981 shares and issued another to Whalen for 82,115 shares of stock of the Whalen company, and thereafter, by agreement between Lay and Whalen, the last mentioned certificate was canceled and a new one, numbered 1190, of date June 22, 1898, for 72,118 shares of Whalen company stock, was issued to Whalen in his name, and was by him deposited with Albert W. Barnum for the benefit of the partnership. All of said stock, and in addition thereto 1865 shares not represented by any outstanding certificates, was and is the partnership property. Whalen claims that certificate 1190 is his, and that he will vote the same at the next annual stockholders' meeting, and elect, as he would thereby be able, a board of directors hostile to complainant and Lay, and would exclude complainant and Lay from all management and control of said Whalen company and from bene-

fits and profits of said partnership. Whalen has stated that after January 1 inst. said partnership would not exist. For many months past complainant has been unable to procure an accounting from Whalen, and, to-wit, $10,000 of partnership money has been expended by him or is in his possession. Whalen has threatened and intends to obtain from Barnum stock certificate No. 1190, and to dispose of the same as his own. Unless Whalen is restrained from obtaining said certificate and Barnum is restrained from delivering the same to Whalen, complainant will suffer irreparable loss, etc. Prayer for injunction, and accounting, dissolution of partnership, etc.

"January 10, 1899, Lay filed an answer, admitting the allegations of the bill, and also a cross-bill, by which he adopts as part of his cross-bill the averments and prayer of the bill.

"February 1, 1899, Albert W. Barnum filed his answer, neither admitting nor denying the allegations of the bill, and at the same date he filed a cross-bill, averring, in substance, that June 22, 1898, Whalen, Stephens and Lay called at his office together and deposited with him certificate No. 1190, for 72,118 shares of stock of the Whalen company, and that it was then understood that he was not to part with said certificate without the joint consent of Whalen, Stephens and Lay, and that the certificate was still in his possession; that it runs in the name of William Whalen, and that he holds it as a mere trustee and stockholder, subject to the order of said three persons, and has no interest in it, and is willing to deliver it to the person or persons entitled thereto, and offers to bring it into court, etc.; prays that Stephens, Whalen and Lay may be required to interplead, etc., and that they may be restrained from commencing any action against him. The cross-bill is sworn to.

"Stephens and Lay answered Barnum's cross-bill, but April 10, 1899, by agreement of the parties, certificate No. 1190, for 72,118 shares of the Whalen company stock,

was turned over to and impounded with the clerk of the court, subject to the further order of the court, and thereupon the cross-bill of Barnum was dismissed and he was discharged from further liability.

"March 3, 1899, Whalen filed his answer to the bill. He admits entering into a partnership agreement with the complainant and Lay, but neither admits nor denies that what purports by the bill to be a copy of the agreement is a true copy; admits that Stephens and Lay at the outset furnished him some assistance in the way of services, and that by the agreement the St. Peter's company stock was to remain in Barnum's hands, and avers that on September 30, 1897, said stock was turned over to Lay for the partnership of Lay, Stephens & Whalen; avers that Albert W. Barnum was his attorney and had in his possession 79,981 shares of the Whalen company stock which he, Barnum, delivered to the directors of the St. Peter's company September 30, 1897, or soon thereafter, and that said board of directors delivered the same to him, Whalen; that said shares were represented by small certificates which he, Whalen, had canceled for a new certificate which was issued to him, and which was retained by him until June 22, 1898, when he deposited it with Barnum to act as custodian of the same and as his agent for the sale and disposal of the same. The remainder of the answer consists substantially of a denial of material allegations of the bill. In respect to the alleged agreement of February 10, 1898, he avers that he can neither read nor write, and that if he signed that agreement he did so by reason of false representations of its contents; that it was never read to him and he did not know of its existence until it appeared in the bill. In the concluding part of his answer he admits that there should be an accounting of the partnership transactions.

"The issues having been made up, the cause was referred to the master to take proofs and report the same with his conclusions. The master reported, finding, in

substance, that the partnership assets consisted of 73,340 shares of the capital stock of the St. Peter's company, certificate No. 1190 for 72,118 shares of the capital stock of the Whalen company, and in addition 1865 shares of the latter company for which certificates had not been issued, and that all of said shares should be divided equally between Stephens, Lay and Whalen; that Stephens was indebted on the partnership accounting to Whalen in the sum of $479.17, and that on the payment by Whalen to Stephens of the costs which had been paid by Stephens, Stephens should pay said sum to Whalen, and that on the partnership accounting Stephens was indebted to Lay in the sum of $790.02, which he should be ordered to pay, and that complainant was entitled to the relief prayed. The court overruled all objections except the tenth and eleventh, which are unimportant, and decreed in accordance with the master's report. From the decree so rendered the appeal is taken."

W. P. SHOCKEY, and J. D. SPRINGER, for appellant.

JESSE A. & HENRY R. BALDWIN, for appellee Thomas C. Stephens.

Per CURIAM: In deciding this case the Appellate Court delivered the following opinion:

"The chief question in controversy is whether appellees, Stephens and Lay, have any interest in the stock of the Whalen Consolidated Copper Mining Company. Complainant and Lay claim that they have each one-third interest in said stock. Appellant claims the stock is wholly his, and that appellees have no interest whatever in it. There is no controversy between the parties as to the amount of the Whalen company stock in question.

"The Whalen company is an Illinois corporation, and its capital stock, the number of shares into which it is divided and the par value of each share are as stated in the bill. The location of its principal office is in Chicago,

and May 17, 1882, its articles of incorporation were duly recorded. The St. Peter's company is also an Illinois corporation. Its capital stock is $5,000,000, divided into 100,000 shares of the par value of $50 each. The location of its principal office is in Chicago, and it was organized March 5, 1887. Whalen subscribed for 99,996 shares of the stock of the St. Peter's company, and prior to and at the date of the partnership agreement was president of the company. He also subscribed for 99,996 shares of the stock of the Whalen company. Prior to the date of the partnership agreement the St. Peter's company and the Whalen company each had mines in Nevada,—the former silver and the latter copper mines,—but appellant, who was the manager of both companies, was confined in the Missouri penitentiary for three years expiring July 13, 1897, for obtaining money by false pretenses, as appears by his own letter, and during that time the mining properties in Nevada were lost by the companies. At the date of the partnership agreement the Whalen company had no property, and the only property which the St. Peter's company had was certain stock of the Whalen company which had been donated to it by appellant. Such was the situation at the time appellant commenced negotiations with appellees which culminated in the partnership.

"Lay testified that about July 20, 1897, he met appellant and had interviews with him several days in succession thereafter; that appellant told him of wonderful copper property which he had owned in Nevada but had lost and then had no title to it, and asked the witness to assist him to take charge of re-organizing and reviving the company and securing money to acquire the title of certain miners to the property; that witness told him he had no money himself but thought he could secure the assistance of Thomas C. Stephens, the appellee, who had been a banker; that at seven o'clock in the evening the witness, Stephens and Whalen met at the Atlantic Hotel, in Chicago, and for about four hours discussed the whole

matter of securing the Whalen property and the miners' claims, which were then in the hands of Kenney, Doherty and Thomas R. Whalen, a cousin of appellant. 'Appellant said he would like to form a partnership with us, and would give us one-third interest in both the St. Peter's and Whalen companies.' Stephens then agreed that he would furnish appellant the money and a pass to go to Nevada. Subsequently Mr. Hargis drew up an agreement in accordance with the verbal statement made to him by Stephens, which was submitted to Barnum, appellant's attorney, and finally Barnum drafted the agreement of August 12, 1897, which was read over to and signed by the parties. Hargis testified that he had a talk with all the partners before drafting the first agreement, and that Stephens told him, in the presence of Whalen and Lay, that he had given to Stephens and Lay each one-third interest in the Whalen company stock, and that Whalen said that was all right.

"Counsel for appellant now objects to so much of the foregoing evidence as relates to negotiations between the parties prior to the execution of the written agreement of partnership. No objection was made to the evidence when taken, nor among the objections to the master's report is there any objection relating to the admission, exclusion or refusal to exclude evidence. The objections to the master's report were ordered to stand as exceptions on the hearing. The hearing is limited to questions of this nature raised by the exceptions, and when such question is not so raised error cannot be assigned in respect to it. The objection comes too late. (*Prince* v. *Cutler*, 69 Ill. 267; *Pennell* v. *Lamar Ins. Co.* 73 id. 303; *Jewell* v. *Rock River Paper Co.* 101 id. 57; 14 Am. & Eng. Ency. of Law, 944.)

"An additional reason why appellant cannot avail of the objection is, that he, being examined by his solicitor, gave his version of the negotiations between him and the appellees prior to the execution of the written agree-

ment, materially contradicting the testimony of Lay and Hargis.

"In *Moyer* v. *Swygart*, 125 Ill. 262, a bill was filed to set aside a will. The court say: 'Both parties gave in evidence the statements and conversations of decedent, made by and had with him long before the making of the alleged will, and neither party will now be heard to insist such statements and conversations were not competent evidence.' (Ibid. 277.)

"By the express terms of the partnership agreement Whalen transferred to the partnership of Whalen, Lay & Stephens, for their joint interest, all his stock in the St. Peter's company. Before the execution of the agreement Whalen had transferred to the St. Peter's company all his stock in the Whalen company, and at the date of the agreement it was held by the former company. The stockholders of the St. Peter's company were therefore the equitable owners of the stock of the Whalen company, and Whalen, knowing that the St. Peter's company held all the Whalen company stock, must, we think, have intended by the agreement to transfer to the partnership the Whalen company stock. The object of the partnership is stated in the agreement to be 'to take the necessary steps to revive and re-establish the Whalen company, and to re-open and renew operations upon what are known as the Whalen mines, in the Antelope mining district, in Eureka county, Nevada, and to proceed at once with the work and development of said mines.' The mines referred to in the agreement by the words 'known as the Whalen mines,' are the Whalen copper mines. This clearly appears from the evidence, including Whalen's testimony. The contract further provides for the procuring of books and papers belonging to the St. Peter's company, and calling stockholders' and directors' meetings of that company for the purpose of reviving and re-organizing the Whalen company. The expressed consideration for the transfer by Whalen of his stock to the

partnership is, that each of the partners shall engage his best services and endeavors in and about promoting the interests of Whalen and the Whalen company.

"By the agreement Whalen was to have the exclusive management of the mines and the control of the employees. No salaries were to be paid until the mines should produce an income in excess of all expenses. The agreement provides that the partners shall consolidate their several interests into one interest, and that at the end of the partnership the partners shall account, each to the other; 'and all and every the stock and stocks, and increase thereof, which shall appear to be remaining, either in money, goods, stocks, wares, merchandise, fixtures, debts or otherwise, shall be divided between them, share and share alike.'

"The sole final purpose of the partnership, as expressed in the agreement, was to work the Whalen copper mines. No intention whatever is expressed or indicated of working the St. Peter's mines. If, then, as Whalen claims, his partners, Lay and Stephens, acquired no interest in the Whalen company stock, they bound themselves to furnish money, their time and best services and endeavors in promoting the interests of a company in which they had no interest whatever and in the profits of which they could not participate,—in other words, for practically nothing; because, with the exception of the Whalen stock, the St. Peter's company had no property, and its stock was consequently worth nothing in the market. The partnership not being bound by the agreement to work the mines formerly belonging to the St. Peter's company, or any mines in the name of that company, the provision above quoted for the equal division between the partners, at the termination of the partnership, of all profits, stocks, etc., of the partnership, is, if the appellant's contention be conceded, utterly meaningless. 'Courts will seek to discover and give effect to the intention of the parties, so that the performance of the con-

tract may be enforced according to the sense in which they mutually understood it at the time it was made. And greater regard is to be had to their clear intent than to any particular words which they may have used to express it.' (*Minnesota Lumber Co.* v. *Coal Co.* 160 Ill. 85.) And for the purpose of ascertaining the intention of the parties, the court will endeavor, by extrinsic evidence of such facts as the parties had in view, to place itself as nearly as possible in their position, so that it may understand the language used in the sense intended by them. (*Doyle* v. *Teas*, 4 Scam. 202; *Barrett* v. *Stow*, 15 Ill. 423; *Sigsworth* v. *McIntyre*, 18 id. 126). In seeking to ascertain the intention, regard will also be had to the practical construction, if any, which the parties, by their acts, have given to the contract. (*Leavers* v. *Cleary*, 75 Ill. 349; *Alexander* v. *Tolleston Club*, 110 id. 65; *Crown Coal and Tow Co.* v. *Yoch Coal Mining Co.* 57 Ill. App. 666.)

"In *Doyle* v. *Teas*, *supra*, the court repudiates the rule announced by Lord Bacon, that a patent ambiguity can not be explained by parol evidence, and quotes with approval this language from *Fish* v. *Hubbard*, 21 Wend. 651: 'It is impossible to sustain this rule if we take ambiguity in its broad sense of doubtfulness, uncertainty and double meaning.'

"After executing the agreement Whalen went to Nevada, Stephens having furnished him with money to pay his expenses and railroad transportation as far as Omaha and secure contracts for the copper mines formerly owned by the Whalen company. That a meeting of the stockholders of the St. Peter's company was held about September 30, 1897, at which a board of directors was elected, and the directors were authorized to liquidate an alleged indebtedness of the company to Whalen, and to transfer to him 79,980 shares of the Whalen company stock theretofore donated by Whalen and wife to the St. Peter's company, and that subsequently the board of directors transferred to Whalen 78,740 shares of the Whalen com-

pany stock, and passed a resolution that the remaining shares not so transferred should be transferred to Whalen when all debts due by the St. Peter's company should be satisfied, are matters not controverted. The appellant in his answer admits that 79,891 shares of the Whalen company stock were delivered to him by the directors of the St. Peter's company, and that in lieu of small certificates of the same a single certificate was issued by the Whalen company when that company was organized and had elected a board of directors. The evidence shows that on October 1, 1897, the Whalen company issued to Whalen a certificate for 79,470 shares in his name, on which certificate is endorsed an assignment or transfer to Messrs. Lay, Stephens and Whalen, signed 'Wm. Whalen,' and on which is also endorsed: 'Canceled by request of William Whalen and certificate No. 1084 issued in lieu of same.—Charles Lay, Secretary and Treasurer.—November 1, 1897.' Whalen's signature to the assignment was proved.

"Stephens, Lay and Whalen were elected directors of the company, and Stephens was chosen president, Whalen vice-president, and Lay secretary and treasurer of the Whalen company on its re-organization. November 1, 1897, the Whalen company issued to Lay, Stephens and Whalen certificate No. 1084, for 78,980 shares of the stock of that company. Lay testified that Whalen was present at a majority of the meetings of the board of directors. The agreement of February 10, 1898, between Lay and Whalen, a copy of which is contained in the statement preceding this opinion, shows what became of certificate 1084. It was provided by that agreement that certificate 1084 should be canceled and a new certificate, to be numbered 1136, for 82,115 shares, should be issued to William Whalen. The agreement contains the following significant language: 'To be held by him, the said William Whalen, for the present, being all the time the property of the said Lay, Stephens & Whalen.'

"Lay testified that the agreement was drawn under the following circumstances: Whalen had told him, Lay, that he, Whalen, had made a statement that there had been more stock sold by him to third parties than there had been sold to one Cooper, and asked him, Lay, to prepare a statement which he, Whalen, could use to exonerate himself; that the stock could be canceled and left in such a condition that it could be stated to have been issued to Whalen, and that it could be placed in Barnum's hands; that he, Lay, then told Whalen that it would be impossible to cancel the certificate so far as Stephens was concerned, he being absent, but that so far as they two were concerned they might do it. Stephens, who, at the time of the agreement was absent in Boston on business of the Whalen company, had left his signature to about twenty blank stock certificates, to be used, if necessary, in the sale or transfer of stock. In pursuance of the agreement of February 10, certificate No. 1136, of date February 10, 1898, for 82,115 shares, was issued to William Whalen. Endorsed on the certificate is a blank for an assignment, no name of transferee or assignee being filled in, signed 'William Whalen.' June 22, 1898, after Stephens returned from Boston, certificate 1136 was canceled and certificate 1190, for 72,119 shares of Whalen company stock, was issued in Whalen's name. Lay testified that when certificate 1190 was issued, he, Stephens and Whalen went to Barnum's office and left it in Barnum's hands in escrow; that while they were all present in Barnum's office, Stephens asked Barnum if he would charge anything for taking and holding the stock, and that Barnum said that as it came under the contract agreement for him to hold it in escrow he would make no charge for doing so.

"The issue to the partnership of Whalen company stock, Whalen being vice-president and a director of the Whalen company at the date of such issue, the transfer by Whalen to the partnership of stock issued in his name,

the agreement between Whalen and Lay of February 10, 1898, and the depositing certificate 1190 with Barnum by and for the partnership, are not only evidence that it was the intention of the parties in executing the agreement of August 12, 1897, that the Whalen company stock should be partnership property, but are, as we think, inconsistent with any other reasonable hypothesis. These acts are a practical construction of the partnership agreement by the parties. Whalen in his testimony admitted that about the date of the February agreement he signed a paper for Lay, but that he could not read and did not know what it was; that he had promised Lay and Stephens 1000 shares each of Whalen company stock when the Whalen company should be on a paying basis if they would act honorably with the company and in his interest; that Mr. Lay said that Stephens and Lay ought to have something to show what had been promised them, and that the paper was read to him in that way. Lay not only testified as above stated in respect to the conversation between him and Whalen which preceded and led up to the execution of the agreement, but further testified that the contract was in duplicate and that Whalen took one of the duplicates—facts inconsistent with Whalen's evidence. Whalen testified that he could read figures when plainly written and could write his name.

"Whalen attempted to avoid the effect of the testimony that certificate 1190 was deposited with Barnum in escrow by producing a receipt from Barnum for the certificate and a power of attorney from himself to Barnum, both of date June 22, 1898, in respect to the shares evidenced by the certificate, which receipt and power of attorney are wholly inconsistent with the hypothesis that the certificate was partnership property or was deposited by and for the partners, and by testifying that he, Lay and Stephens were present when the receipt and power of attorney were executed, and that they were read in their presence. It was testified by Lay and Stephens that on

June 22, 1898, they, Lay and Stephens, left Barnum's office together; that Whalen said he had some private business with Barnum and remained in the office after they left, and that they had no knowledge whatever of the receipt or power of attorney. William H. Gruver, an attorney at law and notary public employed in Mr. Barnum's office, and who took, as notary, Whalen's acknowledgment to the power of attorney, testified that Lay and Stephens were in Barnum's office the day the power of attorney and receipt were executed, but that they left the office before they were executed, and that at the time of the execution of the papers the only persons present in the office were himself, Whalen and Barnum. We think the master was warranted in discrediting Whalen's testimony.

"Certain documentary evidence introduced by appellees tends to support their contention that the Whalen company stock was the property of the partnership. Among such evidence is an account signed by Whalen and sent by him from Nevada to Lay, which is headed 'Private account of Stephens, Lay & Whalen.' It is dated June 1, 1898, and relates solely to expenses incurred, etc., in connection with the working of the copper mines in Nevada. The last item in the account is: 'June 2.—Company owes up to date $113.98.' Appellant's counsel contend that the words 'Private account of Lay, Stephens & Whalen' are in a different handwriting from the remainder of the document, and a forgery, and the original document has been produced for our inspection. Frederick Mannheim, who was appellant's clerk at the date of the document, testified that he wrote it at appellant's dictation, and that the entire document, except the signature, 'William Whalen,' was in his (the witness') handwriting. Our opinion is, on inspection of the document, that, excepting the signature, it is all in the same handwriting.

"Eight letters written by appellant while in Nevada, to Lay, were put in evidence by appellees. These letters

indicate that the stock of the Whalen company was partnership property. In a letter of date May 24, 1898, this occurs: 'I would like to put some miners to work in two or three of the mines. I will say again, about sixteen men for two months, say from June to July, would make Siegel & Cooper crazy, or anybody like them. Then our stock will be worth $200 a share, and a great deal more than that.' In his letter of August 17, 1898, appellant writes: 'Will yourself and stockholders give me an option on your stock for six months? You both ought to be willing to do this,' etc. In his letter of August 18, 1898, he writes: 'Before yourself and the rest of the directors of the majority of the board closes the office, I presume yourself and Mr. Stephens ought to be very willing and glad to give that option that I asked for in my letter of the 16th, the proposed stock that you both got by contract which is in escrow, which has not cost either of you a cent; on the contrary, you are money ahead. Under the present circumstances yourself and Stephens can't have much value on the stock, so I am looking for you to give me a very low option, and that will relieve you and Stephens of the great strain that you claim you are undergoing.' The only stock in escrow, so far as the evidence shows, is the stock placed in Barnum's hands by the partners June 22, 1898. In his letter of August 20, 1898, he again asks for an option, writing: 'I hope you and Mr. Stephens will give me a reasonable option on your stock,' etc. In his letter of September 1, 1898, he writes: 'I will give both of you $20,000 apiece if you will give me an option on your interest, as I have asked for before.'

"It appears from the evidence, including one of appellant's letters, that money, the proceeds of sale of the Whalen company stock, was deposited in bank, by appellees' consent, in the name of Lay as trustee, and that appellees were authorized by appellant to draw on the bank account. Whalen in his testimony refers to money,

the proceeds of sales of the stock in question, as his private funds.

"Seven witnesses testify to admissions by appellant that appellees were his partners in the business of the Whalen company and in working that company's mines. There was conflicting evidence on the part of appellant, comment on which would unnecessarily and profitlessly extend this opinion. Suffice it to say we regard the master's conclusions of fact well supported by the evidence.

"It clearly appears from the evidence that the sole purpose of re-organizing the St. Peter's company was to procure a transfer by that company of the Whalen company stock. The company after its re-organization and the transfer of that stock did nothing more. It also appears from the evidence that there was no intention on the part of Whalen or either of the other partners to operate any mines except the Whalen company copper mines. It was testified by Stephens, and his testimony was not contradicted, that the partners owned all the stock of the St. Peter's company. Owning all the stock, they were able to control the company's affairs.

"Appellant's counsel contend that the St. Peter's company could not lawfully hold the stock of the Whalen company, citing *People* v. *Chicago Gas Trust Co.* 130 Ill. 268. If this proposition were sound, we cannot perceive how it would help the appellant. If the donation by appellant to the St. Peter's company was void, then the stock remained the property of appellant and he could lawfully contract for its becoming partnership property. The case cited is not the least in point. In the articles of incorporation of the gas company one of the objects of incorporation was stated to be to purchase and hold or sell the capital stock of other gas or electric companies. The question negatively decided was whether the power to so hold or sell could be conferred on the gas company under the general incorporation law of this State. It was not decided in that case, nor has it been in any other case

so far as we are aware, that a donation of money or personal property cannot lawfully be made to a corporation.

"It is also contended by counsel for appellant that no cause warranting a dissolution of the·partnership was proved. Stephens testified that during the summer of 1898 Whalen stated to him, in the presence of Lay, that after January 1, 1899, there would be no further partnership. It is apparent from the letters heretofore mentioned, written by Whalen to Lay, that there was a radical difference between the partners as to how the mines should be operated and that Whalen was bitterly antagonistic to his partners. In his letter of September 6, 1898, to Lay he writes: 'One of these days you will have to account for falsehoods and insults in touching my personal character, in the courts. Just as sure as God is in heaven I will try and bring you to justice. It's an old saying, and a true one, that 'It's a long road without any turn in it.' * * * I see you have turned the business of the company into scandals that was never proven that such things or scandals ever existed. * * * You are like Siegel & Cooper—either rule or ruin. Yes, if there was $100,000 or $1,000,000, and yourself and Stephens had access to it as you did have, there would be nothing left for Mr. Whalen. * * * The understanding was, and the pledge was, that you both would not tell any one about the contract that was made between us. We did shake hands and word on this,—the three of us,—but you both broke your pledge and told it to the two Jews. Then you set them wild to try to get a block of stock for nothing. This it was that caused all this blackmailing ·business. It's my opinion that you'll make the same accomplishment as you did in Michigan City, and as you did in Chicago when you were secretary of the bicycle company. I'm sure I was not connected with either of those two enterprises. Yes, I knew all along that the outside stockholders did not know the rascality that was going on, and that is why you didn't want to send their names and

addresses. As long as you picked out remarks out of Mr. Shindel's report, why didn't you pick out all of it? Your action proves to me, and the letters you write, that you are just as crooked as a crooked stick could grow. Your history will come out after a while, but I suppose you won't care. You have cheated the prisons out of a victim. There is plenty of honest men in them, and the Lord knows but you'd have your dues if you were there. But as I said before, it's a long road without a turn. I don't want to waste paper in writing more to you.' As before shown, appellant was so anxious to dissolve the partnership that he offered his partners $20,000 each for an option on their interest.

"In *Singer* v. *Heller*, 40 Wis. 544, the court say: 'The law seems to be well settled that a court of equity will dissolve a partnership when the disagreements and disputes between the parties have become so violent and lasting as to prevent any beneficial results from the continuance of the connection,'—citing authorities. In *Girard* v. *Gateau*, 84 Ill. 121, the court say: 'That such embittered relations may exist as would render it impracticable to conduct the business and justify a decree dissolving the partnership admits of no discussion, on principle as well as upon authority.' (See, also, cases cited in note 2, 17 Am. & Eng. Ency. of Law, p. 1105.)

"We are of opinion, from the evidence, that such embittered relations exist between appellant and his partners as render it impracticable for them, as partners, to conduct beneficially the business of the partnership.

"Lastly, it is objected that the master should have reported a statement or account showing, in detail, what each partner owed to the others and to the partnership, and what the partnership owed to each of the partners. The objections to the master's report, which stood as exceptions on the hearing, do not include any objection to the form of the report. The objections numbered 34 and 35 are as follows:

" '*Thirty-fourth*—To the finding that the complainant is indebted to this defendant upon the partnership accounting had before the master in only the sum of $479.17.

" '*Thirty-fifth*—To the finding that upon payment by this defendant to said complainant of the cost of this proceeding said complainant should be ordered to pay to this defendant only the sum of $479.17.'

"These are the only objections relating to the accounting, and we do not find them sustained by the evidence.

"Filed in the cause is what purports to be an abstract of the record. Little or no attempt at condensation has been made in its preparation. Questions to and answers by witnesses appear as in the record. The rule of the court requires that printed abstracts of the record,—not printed copies of it,—shall be filed.

"The decree will be affirmed."

The facts are correctly stated by the Appellate Court; and we concur in the conclusion reached by them, and in the reasoning by which that conclusion is supported. Accordingly, the judgment of the Appellate Court is affirmed.                                    *Judgment affirmed.*