## Theresa M. Crane, Administratrix, v. Matilda M. Clemens.

### Gen. No. 13,177.

1. CONTRACT—*what appropriate to aid construction of ambiguous.* An ambiguous contract may be aided by extrinsic evidence showing the construction placed thereon by the parties thereto.

2. USURY—*when contract not tainted with.* A contract guaranteeing fifteen per cent. per annum by way of "interest or profit," is not tainted with usury where it appears that such contract represented the entry into a joint enterprise or *quasi*-partnership undertaking.

Contested claim in court of probate. Appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1906. Affirmed. Opinion filed June 25, 1907.

**Statement by the Court.** Appellee filed in the Probate Court of Cook county her claim for $7,000 against the estate of Gustav A. Bode, deceased, which that court disallowed. She appealed to the Circuit Court, where the claim was allowed. From the order of the Circuit Court the administratrix prosecutes this appeal.

The evidence introduced consisted mainly of letters between appellee and Gustav Bode in his lifetime, including an agreement in writing bearing date January 2, 1893, which agreement with indorsements thereon is as follows: .

"This agreement entered into this second day of Jan'y, 1893, by & between Gustav A. Bode and Mrs. M. M. Clemens, to-wit, 'the said Gustav A. Bode agrees to accept, from Mrs. M. M. Clemens the sum of six (6) thousand dollars ($6,000) on which the said G. A. Bode agrees and guarantees a net profit to the said Mrs. M. M. Clemens of not less than 15% per annum, said interest or profit to be paid between Jan. 5 & 15 of each year, less $900, which $900 will be mailed to Mrs. M. M. Clemens in monthly lots of $75 per month or

Crane v. Clemens.

$900 in 12 months. It is further agreed that $3,000 shall be paid back to Mrs. M. M. Clemens or her heirs in 5 years from this date Jan. 2, '93, and the remaining $3,000 in eight years from this date, Jan. 2, '93. In the event of the death of the said Gustav A. Bode, the said Mrs. M. M. Clemens agrees to surrender this instrument to the widow of the said Gustav A. Bode, who will pay to the said Mrs. M. M. Clemens the entire six thousand dollars, together with an approximate of the profits earned since the date of last settlement. This is not transferrable only to the heirs at law of the said Mrs. M. M. Clemens, or their guardian, for the heirs benefit. The above named six thousand dollars can be used by the stated G. A. Bode, either in his business or outside of it as his judgment may elect.'                                    $7,000.

GUSTAV A. BODE, $6,000.

M. M. CLEMENS.''

Indorsed on the back of this agreement is as follows: The first indorsement:

''Taking effect January 1st, 1894, the sum total of the within agreement is increased to seven thousand dollars ($7,000) the conditions remaining the same, excepting that this additional one thousand dollars be returned to the said M. M. Clemens, in January, 1895, or January, 1896, just as M. M. Clemens may dictate.

GUSTAV A. BODE.''

''At request of Mrs. M. M. Clemens, the above mentioned one thousand dollars ($1,000) will remain a part of the within contract for two years from Jany. 1st, 1896.

M. M. CLEMENS,

GUSTAV A. BODE.''

''By mutual agreement, the amount is changed from $7,000 to $7,777 and the conditions remain the same as stated in the body of agreement, excepting that time for return of the $7,777 is to be agreed upon Jany. 15, 1901, dated at Galesburg, Illinois, Jany. 14, 1899.

GUSTAV A. BODE,

M. M. CLEMENS.''

"Galesburg, Aug. 3rd, 1900.

Seven hundred and seventy-seven dollars of this contract has been this day refunded, leaving net investment seven thousand ($7,000) dollars. This agreement expires Jany. 15, 1903, in place of 1901.

M. M. Clemens,

Gustav A. Bode."

The first of the letters in chronological order is dated February 14, 1891:

"Matilda M. Clemens,
Dear Friend:

I am in receipt of your favor with agreements signed & also draft for one thousand dollars. I inclose one of the agreements signed by me. I would say more now, but as I am a little rushed I will let it go until next time. Now, that we are partners, I will just simply say that I will do my utmost to make you feel satisfied with this world.

Yours very respectfully,

G. A. Bode."

The second letter is dated January 18, 1892:

"Mrs. M. M. Clemens,
Dear Friend:

I received your letter with draft this forenoon. I think it is best to give you a certificate showing that I have the money and I inclose it. I made it for two (2) years, if you would rather have it for one year send it back & I will exchange it & return it to you. I will do my best for you & remit the profit at same time that I remit the profit on the other $1,000; if you would rather have it some other way advise me & I will do as you wish me. We are glad that Ic's improvement is permanent. Please accept our heartfelt thanks for your well wishes endeavors. Trusting you are having a nice trade I am

Your friend,

G. A. Bode."

The third is a certificate bearing date November 28, 1892:

"This is to certify that I have received from Mrs. Matilda M. Clemens of Fairbury, Illinois, the sum of

$4,550 to be used by me in such manner as to realize her the largest profitable income.

GUSTAV A. BODE."

Underneath the above is written: "Mrs. Clemens, the above will do until you get the other $3,450 in and then I will give you one writing to cover the entire $7,000."

The fourth is a letter written by appellee, the material parts of which, omitting certain references to family matters, are as follows:

"M. M. Clemens,
Manufacturer of
Soda Water, Cider, Ginger Ale, Birch Beer, etc.

FAIRBURY, ILL., Jan. 16, 1893.

MR. G. A. BODE,
DEAR FRIEND:—    *    *    *

I wrote you that I was not just satisfied with the agreement you sent. It was not what I expected and your second letter convinces me we are laboring under a misunderstanding. I thought all the time you expected to use my money in your business & would give me such profits as it realized. Don't you remember me saying before I sold my business I would sell if you would let me put the money in your extract business the same as you had the 1,000, & you said you would, & as you could not make any change in the business until the first of the year you would use what money I sent you to the best advantage until that date; then I understand you was to put it in your business & give me papers to that effect? I don't understand your writing about having it out on 90 days' time when I expected it to go into your business Jan. 1st. When you write the agreement I would much prefer you would say the money was in the business & state a per cent. that it will not fall below; in fact, just duplicate the agreement for the 1,000 only have it for 6,000. (I will just leave the 1,000 as it is as it has one more year to run, & in case I should need the money in one year it will be due at that time.) Have the article for 6,000 drawn up for a period of 8 years as Claude will be 21 then & he can take this

care off of you. I would rather you would mention the amt. you will pay me each month & state it is to be interest on the principal. I have found by keeping account of everything this month that $50 will not run us as up to the 15th my expenses are 39.58/100 & I don't see no reason why it won't be just as much the rest of this month. You see I am paying $10 for rent and $10 for B. & S. for children & that takes quite a piece from $50. I think I will have to ask you to send me $75 per month, & please state in article when bal. of interest is to be paid. I am very sorry of the delay in answering your letter but it could not be avoided. I must stop writing as my eyes are paining me. If I have failed to make myself understood, I hope you will tell me just where, after all of our conversations on this subject, I did not think we would have any trouble about the agreement. I will return the one you sent me when I hear from you again or destroy it as it is not signed. I don't think it will matter what I do with it, but I will keep it until I hear from you again. I am glad you are all well again. When do you expect to move? We are all well but our eyes, & I hope they will be all right soon.

Ever your friend,<br>M. M. CLEMENS."

In a reply dated January 18, 1893, Mr. Bode wrote as follows, a few words not being legible:

"MRS. M. M. CLEMENS,
DEAR FRIEND:—

Your letter reached me this morning and the contents of the same are noted. Mrs. B. and myself are sorry to hear of your eye affliction, and I trust it will leave no bad effect on either of you. I will answer your letter by first saying that I understood that I was & I expect to use your money for your benefit in the extract line. The reason that I loan money for 60-90 and 120 days at a time is, because I nearly always have from $2,000 to 5000 more ready money than the immediate wants of the business justifies, and as I can not get interest from my bank on it, I look about and find a safe place to invest it for the time desired

and thereby make the profit at the end of the year to amount to just—left it unused at the bank, this makes that clear to you, I hope. Now then, about the paper I sent you, in the first place, if I gave you an ordinary partnership paper then in case of my death you would be obliged to depend upon the ability of the administrator to turn the real estate & other assets into cash, and in case of bad handling or financing (as is often the case with estates) you might not realize all that is coming to you and even if you did get every cent you would get it much later than if it is done as I intended for it to be done. I will try to explain my object & also my desire in sending you the paper I did; first of all comes the matter of safety, that is to make you perfectly safe in case of my death. To do this I put an insurance of $10,000 on my life, which is payable to my wife. Out of this she will pay you the amount due you, and as this insurance money is not a part of the estate, it will not come under the jurisdiction of the court, and this will simplify matters to such an extent that you can close it up among yourselves by you giving her my paper back and she giving you the cash. Should Mrs. Bode die first, then I would have your name put on the policy to the amount of your investment and then you would in that event also be safe. I want to arrange every thing to your entire satisfaction and at the same time make it as simple and easy as possible for you to get all of your money back at the earliest possible moment after my death, should it happen during the time I have your money and it is the * * * at heart 'X X' when I made out the paper. Regarding the % you will get I can simply say that it will be just as large as what my own % amounts to, and while I never expect to see it as low as 15% it might by unexpected conditions of the trade come to that, but I rather look for it to go to 25% or 30% before 5 years, as the business is growing and the quality of the extracts are making new trade continually, but then what is the use of talking about that here. The whole thing must be left entirely with me to make the result good and the returns to you correct, it is therefore necessary above all

other things that you have explicit confidence in me. Without this you will never be contented, and furthermore, I must insist on returning the money to you forthwith if you feel the least concern about its safety or mistrust me incapable of doing as I said I would or that I will not do so, even if I could. I have tried to make myself plain and if there is anything about this letter that is not perfectly clear to you I wish you would write me about it and I will explain more fully if possible. I shall take a tissue copy of this so that I can easily refer to it should you find it necessary to ask concerning it. I have changed the monthly remittance to $75 and as I told you when here if you needed more just say the word and I shall send it. I shall await your reply regarding the agreement and if you still think that you would rather have a regular partnership agreement you shall have it, although I feel I have done the very best that can be done for safety, simplicity and prompt liquidation in case of my death. You say in 8 years Claude will be 21 years old. Don't you think that when he gets to the age of 18 or 19 that by your guidance he can start in to properly care for and look after money matters? I appreciate the fact that young men entrusted with two or three thousand dollars at that age are liable to underestimate the value of money, but I feel that Claude is a boy who will grow up into manhood realizing just what money is worth. The flat is about ready for occupancy but I shall wait a while longer as I want to make sure that Gustav is entirely clear of the after effects of measles, especially as the brick-work and plastering was done in cold and partly rain weather.

Hoping to hear from you as soon as you can conclude, I am your friend,

G. A. BODE."

Appellee answered as follows:

"FAIRBURY, ILL., Jan. 20, 1893.

MR. G. A. BODE:

DEAR FRIEND: Your letter was received last evening. You are so kind to let me have the agreement written as I wish & my dear friend, I do trust you thoroughly & I have perfect confidence in your ability

to do as you say & know you will if you can. My sending you the money before we had the written agreement proves to you I trust you. Forgive me for troubling you so much about this, but I realize life is short and I don't think I will live very long. In case of my death these papers will pass into the hands of the childrens' guardian & on the other hand, should you be taken away you know how an estate becomes involved in law. It was so kind in you to have your life insured as you say for security to me. But I understand for that to be security the amt. coming to me should be named now & I have a copy of the policy, otherwise Mrs. Bode could use her own pleasure about paying me or keeping it all. Oh! I do wish I did not have to write such things. You must understand me. I am so afraid I don't express myself right. If I was there I could say what I want to and I know it would not sound as it does when it is written. You know I want you to live years & years after I am gone and I think it likely you will, for you have something to live for.

Regarding the agreement I think you know from my last letter about what I want. I do not want to trouble you too long with this money, & as you suggest Claude may be able to do for us by the time he is 18 or 19, which will be in five years. I will just leave the 1000 as it is & will take that off your hands in one year & then if you will make 3000 payable in five (5) & the other 3000 in eight (8) years. I would prefer the agreement written as the one is for 1000, giving me an interest in your business for a certain length of time, but as you probably have my last letter before this you will know just what I want. &ast; &ast; &ast;

With love to Mrs. B. & children & regards to yourself, I am your friend and tormentor,

M. M. CLEMENS."

The next letter is as follows:

"FAIRBURY, ILL., Jan. 23rd, 1893.

MR. G. A .BODE,

DEAR FRIEND:

Your letter received, also the agreement. I am pleased with the agreement and am very sorry I have

troubled you so much about it. I want you to know I feel perfectly satisfied & shall not worry at all. I know you will do just what you agree to. There is not another man on earth that I could trust my all with & not feel afraid I might lose it. But my inner self tells me this is all right & I know it is. I return the agreement signed by me. I also send the one for 1100. The ones for 7000 that are not signed I will destroy. We are having pleasant weather here now, it is nice sleighing, but I think we will lose the snow before long if the weather continues so warm. I suppose Mrs. Bode is very busy getting ready to occupy her new house. Give her my love and tell her I am always glad to receive a letter from her. Thanking you for your kindness, I am as ever

Your friend

M. M. CLEMENS."

The agreement referred to in the foregoing letter appears to be the agreement dated January 2, 1893, first above set forth. A letter dated February 24, 1901, is the last of those written by the deceased, who died a few days after. It is as follows, omitting certain portions relating to family matters or not apparently relevant:

"MRS. M. M. CLEMENS, Munchen, Ger.
DEAR FRIEND:
     * * * It is just two months ago to-day that we arrived home and they have been without question the busiest sixty days as well as the most trying that I ever lived through. It was not until yesterday forenoon that I was able to get 1900 figured out correctly and you know how anxious I am to get such matters off my hands as soon after the end of the year as possible, but it seemed that one thing and then another turned up to hamper me. * * * In spite of the fact that I was away from the business this past summer a good part of the time that I could have increased the total net profit, the profit would have been 21% but for the one loss of the matter of nearly $1,000. This loss is in such shape that it can not be considered an asset, as it may never pay out more

than 10%, and on this account I have charged it to profit and loss.  If the party should get on his feet again I may be able to realize on it with interest, but in the present condition he is in, it makes the case a very doubtful one and as such as I do not think it advisable to call the claim an asset.  The net profit of all invested is a fraction of a mill over 18%.  I will carry the fraction over and call it even 18%, on which basis I remit.

Jan. 1, 1900, to June 30, 1900, $7,777 at 18%,   $699.93
June 30,      to Aug. 1,  1900,  7,700    " "       115.50
Aug. 1        to Dec. 31, 1900,  7,000    " "       525.00

                              Total,        $1,340.43
              Remitted during 1900             900.00

                                               440.43
For Jan. & Feb. 1901,                          150.00

                                               590.43

Money order on B-V Bank of Munchen enclosed herein 590.43.

It is my sincere wish that you will be satisfied with the result and I feel contented because I know that I did better than several of the rest that are at it.''

The defendant introduced also a letter from appellee to appellant's attorney which is as follows:

"M. M. CLEMENS,
828 North Cherry street, Galesburg, Ill.
Oct. 16, 1902.

ATTORNEY FRANCIS E. CROARKIN,
      Chicago, Ill.
DEAR SIR:—

I just received in this morning's mail a letter from my attorney Mr. Wm. D. Godfrey, stating you wanted an itemized statement of all payments received by me from Mr. Bode, as interest or otherwise, during his lifetime.  I immediately went to Mr. Godfrey's office but he is out of town and will not return until next Monday.  His secretary showed me your letter of Oct. 10, making the request for statement.  I am sorry he did not notify me sooner for then I could have consulted

him and no doubt he could have explained to you in less words what I think you should know to thoroughly understand both the business and friendly relations concerning my contract with Mr. Bode. You state there are some things you do not understand. I will try to explain.

Mr. Bode and my late husband were sincere friends, a short time before my husband's last illness in 1890 he and Mr. Bode made a trip together looking for a location to enter into a business partnership.

After my husband's death Mr. and Mrs. Bode came to my home in Fairbury, Ill., & Mr. Bode told me my husband had asked him to look after us in case he (my husband) should die. He said he had a present-ment he would not live long. His presentment proved true, as he died in about four weeks after taking this trip. Mr. Bode kindly offered to help me and I was benefited by his advice. At the time of his death my husband had a business that was bringing us from $300 to $800 per month. We decided to get a man to continue the business for one-half of the profit. This was not successful as the business was decreasing and did not much more than pay expenses.

Through Mr. Bode's advice I decided to take hold of it & ran the business for fourteen months & I was very successful. I brought each month's sales up to what my husband's were during the last year of his life. This was very encouraging financially, but it was very trying on my health and I had two small children that needed my attention. Now that the business was in good standing again, Mr. Bode advised me to sell, stating that he was willing to take the money and give me all he could make out of it in remembrance to what he had promised my husband. He also stated he would be willing to guarantee it would never run below 15%. Hence the contract; a copy of same I enclose to you.

I sold my business together with my home for $7,000. This amount I eventually trusted to Mr. Bode with full consent of Mrs. Bode. Thus you will see our business relations were on a friendly basis & I trust also on a legal basis. Mr. Bode kept his part of the contract faithfully up to his death—a part of the time

the interest slightly exceeded 15% & on the 25th of each month $75 was mailed to me for our living expenses and in January of each year I received a statement of what had been made on my money, and a check for whatever it exceeded $900. The January check usually included the $75 for the said month of January. I cannot send you an itemized statement owing to the friendly relations of the families. I did not think it necessary to keep account of such and as Mr. Bode was much younger than I his death before my own was unexpected. However, I enclose to you a copy of the letter written to me by Mr. Bode, the day before his death. In same he had written a statement of the preceding year, and his check book will show what has been mailed to me. When I first loaned money to Mr. Bode I got a statement on his financial standing and in 1891 or 1892 his standing was $2,000, so you see, while he was making 15% for me on my money he was also making money for himself. Just at the time he received my money he built the brick building now occupied by the family and the office. In said office you will find a picture of my husband in a frame hanging on the wall, unless it has been removed since last May when I was there. This will help you to understand the friendship existing between Mr. Bode and my husband.

Trusting you will pardon the length of this explanation, and feeling confident you will look at the enclosed copy of contract in both the friendly and legal relations, I am

Sincerely yours,

(Mrs.) M. M. CLEMENS.

828 North Cherry street, Galesburg, Ill.

P. S. I am willing to answer any questions you may wish to ask. Any communication from you will receive a prompt reply.

M. M. C.''

There is evidence tending to show that the deceased had paid appellee by checks drawn upon his private account in the Commercial National Bank of Chicago, sums amounting to $5,206.77, that he paid in 1892

and 1893 upon architects' certificates for the construction of his residence $6,382.21, that his manager and his bookkeeper, who as administratrix of his estate is appellant herein, knew nothing about the existence of the contract in evidence between appellee and the deceased until after his death, and did not know whether he received from appellee any money or not, and that the deceased attended to his own private bank account and the bookkeeper knew nothing about that.

The Circuit Court entered judgment for $7,000 in favor of appellee to be paid in due course of administration.

FRANCIS E. CROARKIN, for appellant.

KRETZINGER, GALLAGHER, ROONEY & ROGERS, for appellee.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

It is contended in behalf of the administratrix that the contract of January 2, 1893, represents only a loan of money, that it is usurious on its face, and that the lender has already received "more than the principal and a fair amount of interest." In behalf of appellee it is claimed the agreement and understanding of the parties was that the money was to be employed by the deceased as a part of the capital invested in his extract business, and that appellee was to share in the profits of that business as a partner on equal terms with the deceased, the latter guaranteeing that her share of the profits should not be less than fifteen per cent. on her investment.

By the agreement of January 2, 1893, the deceased guaranteed a net profit to appellee of not less than 15% per annum, "said interest or profit" to be paid as stated; and it was further agreed that the deceased could use the money either in his business or otherwise as he might elect. While the language of the agree-

ment may be susceptible of several constructions as suggested by counsel, yet if its intent and meaning are made clear by extrinsic evidence showing its purpose and the interpretation or construction placed upon it by the parties themselves, it should be given effect in accordance with the intention thus ascertained. Whalen v. Stephens, 193 Ill. 121; Curtis v. Hawley, 85 Ill. App. 429. Looking first at the correspondence which preceded and accompanied the agreement we find the deceased acknowledging receipt February 14, 1891, of the first $1,000 sent him by appellee, with the statement, "Now that we are partners I will just simply say that I will do my utmost to make you feel satisfied with this world." There can be no misunderstanding of this language. The parties appear to have agreed upon a partnership of some kind which, as subsequently appears, was in the extract business carried on by the deceased, appellee having then invested in it $1,000. In January following the deceased acknowledges another remittance from appellee, stating that he thinks it best to give her a certificate showing he has the money, which certificate he encloses, saying "I will do my best for you and remit the profit at the same time I remit the profit on the other $1,000." Apparently therefore the partnership as between themselves continues, appellee's investment then becoming $2,000. In November, 1892, this is increased by an additional sum of $4,550, making in all $6,550. The deceased sends a receipt dated November 28, 1892, for the additional sum "to be used by me in such manner as to realize her the largest profitable income," adding that the receipt so sent "will do until you get the other $350 in, and then I will give you one writing to cover the entire $7,000." That receipt does not appear therefore to have been intended to indicate any change in the partnership relation. Subsequently the deceased appears to have sent to appellee an agreement, of which under date of January 16, 1893, she

complains, as not stating correctly the agreement be-
tween them as she understands it, and which she re-
fuses to sign, saying that she is convinced they "are
laboring under a misunderstanding. I thought all the
time you expected to use my money in your business
and would give me such profits as it realized. Didn't
you remember me saying before I sold my business
I would sell if you would let me put the money in your
extract business the same as you had the $1,000 and
you said you would, and as you could not make any
change in the business until the first of the year, you
would use what money I sent you to the best advan-
tage until that date; then I understood you was to
put it in your business and give me papers to that ef-
fect. I don't understand your writing about having
it out on 90 days time when I expected it to go into
your business Jan. 1st. When you write the agree-
ment I would much prefer you would say the money
was in the business and state a per cent. that it will
not fall below; in fact just duplicate the agreement
for the 1000, only have it for 6000. (I will just leave
the 1000 as it is, as it has one more year to run, and
in case I should need the money in one year it will be
due at that time.) Have the article for 6000 drawn up
for a period of eight years as Claude will be 21 then
and he can take this care off of you." To this the
deceased replied: "I will answer your letter by first
saying that I understood that I was and I expect to
use your money for your benefit in the extract line."
He then proceeds to explain why he sent the agree-
ment which appellee rejected, saying that if he gave
her "an ordinary partnership paper" then in case of
his death appellee might have trouble and delay in
getting back her investment. He tells appellee that
her percentage of the profits will be as large as his,
and while he don't expect it to fall so low as 15% it
might do so under unexpected trade conditions, but he
expects it to "go to 25% or 30% before 5 years as the
business is growing and the quality of the extracts

are making new trade continually.'' Appellee replied under date of January 20, 1893, and after expressing confidence in the deceased said: ''Regarding the agreement I think you know from my last letter what I want.   *   *   *   I would prefer the agreement written as the one is for $1000, giving me an interest in your business for a certain length of time, but as you probably have my last letter before this you will know just what I want.'' Three days later appellee acknowledges receipt of an agreement, saying that she is ''pleased with the agreement,'' sorry that she ''troubled you so much about it,'' returns it signed, and says that she will destroy the others which she has not signed.  Nothing appears in the written agreemen dated January 2, 1893, so far as we can discover, inconsistent with the previous correspondence in which both parties state the understanding and agreement to be that appellee's money was to be used for her ''benefit in the extract line,'' the two to share equally in the profits.  The agreement as written permitted the deceased to use the money either in or outside of his business if in his judgment desirable, thus giving him entire control of all the capital as he had indicated in a previous letter he regarded necessary.  There is no reliable evidence that any of appellee's money was so used, however, and in either event the partnership interest was not intended to be and was not affected by such permission.

That it was the understanding of the deceased himself as well as of appellee that she had a partnership interest to the extent of her capital invested in the extract business of the deceased is shown by the subsequent conduct of the parties.  The letter of February 24, 1901, written by the deceased a few days before his death contained a statement of appellee's share of the profits of the business for the preceding year, and was accompanied by a money order for the balance of $590.43, thus shown to be due her, including payments for January and February of that year.

The letter concludes with the statement that the writer feels contented because "I know that I did better than several of the rest that are in it."

While it is true that in the agreement the words "interest or profit" occur, and that appellee in some letters speaks of "interest" and "loaned money," it is evident that the transaction was not a loan of money at interest. The parties were not pretending to use phraseology legally exact. There is no foundation for any claim that either of them was endeavoring to avoid the usury laws or had any thought of so doing. Appellee's money, as was said in Goodrich v. Rogers, 101 Ill. 523-529, was "employed in business where it might make profits or suffer losses. We do not understand that our statute was ever intended to prevent one person from furnishing capital to another with which the two might embark in trade, although the person advancing the capital might receive profits greatly in excess of the rate of interest allowed by law. In such a case where he takes the hazard of losses arising from the business there can be no usury." In the present case it is true there was an agreement to pay back appellee's capital at a certain time and she was guaranteed a net profit. In Robbins v. Laswell, 27 Ill. 365-369, there was an advance of money by Robbins to Laswell, the profits to be equally divided, and Laswell guaranteed "that the portion of profits coming to Robbins shall not be less than 20 per cent. per annum on the above sum." It was said "the question properly arises here, does this agreement make a partnership? As between themselves we think there can be no doubt. It seems to be well settled that when by agreement persons have a joint interest of the same nature in a particular adventure, they are partners *inter se*, although some may contribute money and others labor. * * * If then parties agree to share the profits they are partners in the profits although one contributes the capital or goods and the other only trouble. * * * It was not necessary that the

parties should agree to share in the losses.'' (Citing cases.) What is said in Parsons on Contracts, Vol. 1 (9th Ed.), p. 187, is in point: ''Though partnerships are usually formed by a participation of both profits and losses, it may be agreed that a partner shall have his share of the profits and not be liable for losses, and this agreement is valid as between the parties. And this agreement will be equally efficacious whether stated in articles or proved by circumstances or otherwise. For the partners *inter se* may make what bargain they will.'' See, also, Rosenfield v. Haight, 53 Wis. 260; Gilpin v. Enderly, 4 Barn. & Ald. Reports, 954; Illingworth v. Parker, 62 Ill. App. 650, citing Lindley on Partnership.

It is urged in appellant's behalf that there had not been a complete settlement of account and of partnership profits between the parties at the time of Mr. Bode's death, that there were still about two months of the year 1901 to be accounted for, that there should have been an accounting, as to which the Probate Court is without jurisdiction. The statement and payment of February 24, 1901, made by the deceased two or three days before his death included, as we have said, payments for January and February of that year, and practically settled the account up to that time. Appellee was at liberty to regard this settlement as conclusive and satisfactory and was not obliged to make any other or further claim on account of profits, if any, payable under the agreement. The claim is for the sum belonging to appellee held by the decedent at his death and was, we think, properly allowable against the estate.

The judgment of the Circuit Court must be affirmed.
*Affirmed.*