Gust Regas and Spiros Regas, Plaintiffs-Counter-Defendants-Appellees, v. Peter Danigeles and Thomas Pappas, Defendants-Counter-Claimants, Appellants.

Gen. No. 49,083.

First District, Fourth Division.

December 9, 1964.

Rehearing denied January 27, 1965.

Sears, Streit & Dreyer, and Joseph P. Loewy, all of Chicago (Barnabas F. Sears, Joseph P. Loewy, James N. Kosmond, and Gerald M. Sheridan, Jr., of counsel), for appellants.

Nat M. Kahn and James A. Regas, of Chicago, for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Defendants appeal from a decree awarding plaintiffs damages for loss of rental money due to what it found was the arbitrary refusal of defendants to accept tenants in a building held in a land trust for the benefit of the parties herein. Defendants appeal also from the denial of their counterclaim for an injunction, a receiver, an accounting of rentals and disbursements, and an award of damages allegedly resulting from plaintiffs' trespassory occupation of a part of the building by storage of ice-cream parlor

fixtures, as well as damages for injury to the store upon the fixtures' removal.

Plaintiffs cross-appeal from the part of the decree denying their prayer for a judicial sale of the beneficial interests in the land trust and a division of the proceeds according to the rights of the parties under the trust agreement.

There is substantial agreement on most of the facts.

Plaintiffs Gust Regas and Spiros Regas are brothers. Defendants Peter Danigeles and Thomas Pappas are brothers-in-law of plaintiffs. All four were equal beneficial owners of a building which had been placed in trust in 1944. In 1952 a new land trust agreement was executed, naming a bank as trustee, and providing that each beneficiary had the right to an undivided 25 per cent of the earnings, avails and proceeds from the property. The management and control of the property was vested in the owners of 75% of the beneficial interest under the trust. Similarly, the trustee was authorized to deal with the title on the written direction of the owners of 75% of the beneficial interest.[1]

From 1944 until 1952 plaintiff Gust Regas carried on the management of the building, including the signing of leases and the handling of funds, all apparently with the tacit consent of the other three, but with some disputed participation by defendant Danigeles.

---

[1] The relevant portions of the trust agreement are as follows: "Anything in this trust agreement to the contrary, the trustee is expressly authorized and directed to make deeds for or otherwise deal with the title to the real estate herein contained on the direction, in writing, of those persons who from time to time shall own 75% of the beneficial interest hereunder. . . . The beneficiary or beneficiaries owning 75% of the beneficial interest hereunder shall have the management of said property and control of the selling, renting and handling thereof, and shall collect, apply and handle the rents, earnings, avails and proceeds thereof, . . . ."

From the time of the 1952 agreement until 1955, there was increased participation by Danigeles, especially through his son George.

In 1954, a tenant who operated an ice-cream parlor in the corner unit of the building, terminated his lease and vacated the premises without removing the fixtures (consisting of a soda fountain, booths and tables, refrigerators, stove, ice-cream making machines and an air conditioner). Gust Regas subsequently bought the fixtures for his own account for $4,500. It is disputed whether Regas tried to rent the corner unit himself for $275 per month through a secret agent, and whether Danigeles told Regas to remove his fixtures.

The falling out of the parties began in 1952 after a particular conversation in which there were charges of a double-cross, and the defendant Pappas never spoke to Gust Regas again except in the courtroom. In 1952 Danigeles had been given authority (along with Gust Regas) to sign checks on the business checking account. After the situation of the fixtures arose in 1954, there was a further deterioration of the relationship between the parties. In April, 1955 Gust Regas withdrew all money from the business account and put it in his own personal bank account without informing the others. Regas also removed the books and records of the business from their customary place at a poolroom operated as a partnership by three of the parties herein, and directed tenants thereafter to forward their rent checks to his residence rather than to the poolroom. His explanation for these actions was that he had discovered some of the records were missing. He continued, as before, to send annual written statements of income and expenditures to the other beneficiaries, and to make a division of the profits.

The corner store containing the fixtures was vacant after June, 1954, and remained vacant at the time of this appeal. Plaintiffs claimed that during this period they found four prospective tenants, all of which were rejected by defendants, thus preventing a lease through the concurrence of the owners of 75% of the beneficial interest. According to plaintiffs, these prospective tenants were: a drugstore, a liquor store, a snack shop and a General Finance Loan Company office. The defendants, however, denied knowledge of the first two prospects and refused to accept the other two, allegedly because the rent was to be only $350 per month as compared with the store's previous rental of $425 per month. They testified that in their judgment the unit should not have been rented for less than $375.

Conversely, the defendants claimed that they found two possible tenants (Imperial Finance and Walgreen) which were refused by plaintiffs. However, plaintiffs testified they had no knowledge of the Imperial lease and contended that the Walgreen offer had already expired when tendered to them.

On December 27, 1955, plaintiffs filed the instant suit.

Both the Master and the Chancellor found that the loss of rental money was due to the arbitrary refusal of defendants to accept two tenants procured by plaintiffs, who were ready, willing and able to rent the vacant store. The Master also found, however, that this arbitrary rejection of tenants gave rise to no cause of action for damages under the controlling document, the trust agreement of 1952. And it is strongly argued by defendants in this court that, whether arbitrary or not, the actions of defendants in rejecting the tenants were within their rights under the trust agreement. The Chancellor overruled the Mas-

275

ter on this point, and the decree found that plaintiffs were entitled to damages.[2]

■ We do not face the need to reconcile this difference between the Master and the Chancellor, because, in our opinion, the evidence does not support the conclusion that defendants' refusal of the leases was arbitrary. The full record discloses that defendants' decision not to rent may reasonably have been based on the fact that the proposed rental was considerably less than the rent of $425 per month paid by the previous tenant. The snack shop lease called for a rent of only $350 per month for the first five years and then $400 per month for the next five years, coupled with a rent concession of 90 days; and there was no evidence of the financial condition, reliability or business ability of the proposed tenant. The proposed lease with General Finance called for rent of $350 per month. Through hindsight it may appear to have been unwise to turn down these leases, but without the use of hindsight we cannot say that it was arbitrary or unreasonable for defendants to have rejected the proposed rentals under all the circumstances.

Accordingly, we hold that the part of the decree finding an arbitrary refusal by defendants to accept tenants is not supported by the evidence; and it is therefore reversed, together with that part of the decree which finds that plaintiffs are entitled to damages therefor.

With this determination, a good many of the contentions raised in this court (particularly the arguments pro and con as to the existence and consequences of a partnership relationship among the

---

[2] There was a re-reference to the Master for determination of the amount of damages.

beneficiaries of the land trust),[3] become inapplicable. The question remains, however, as to what relief may be afforded by the court from an intolerable situation.

■ Plaintiffs appeal from the denial of their prayer for a judicial sale of the beneficiaries' interest in the trust. No Illinois decision has been found which directs or prohibits such a sale. Moreover, we cannot look for guidance to a statutory scheme, since a land trust is a creation of the common law in Illinois. We believe, however, that the fact of deadlock in the management of the business presents a situation calling for relief through exercise of the general equitable power of the court.

■ It is significant that where other types of business association have become paralyzed, courts have called an end to the arrangement. For example, a business trust was dissolved in Wiess v. McFaddin, 211 SW 337 (Tex Civ App 1919); 12 CJS Business Trusts § 11a,[4] and an association for hunting and fishing was dissolved in Eury v. Merrill, 42 Ill App 193 (1891); 7 CJS Associations § 9a(9)(b).[5]

---

[3] The trial court found that there was no partnership.

[4] In 12 CJS Business Trusts § 11a is found the following statement: "Where adequate ground therefor appears, a court of equity has power to decree the dissolution of a business trust, even though the time for which the trust was organized has not elapsed." The case which was footnoted, Wiess v. McFaddin, 211 SW 337 (Tex Civ App 1919), was described as follows: "Where one of the members of a business owning half of its stock, was in hopeless deadlock with the owners of the other half of the stock, making it impossible to proceed with business, it was held that the association should be dissolved, its affairs wound up, and its property partitioned, although the original agreement provided that the trust should continue fifty years."

[5] The following language is from 7 CJS Associations § 9a(9) (b): "Violent dissensions and irreconcilable differences among

Similarly, it has been said in the case of a joint adventure, that where disagreement between the members makes the continuance of the enterprise impracticable, a court of equity will decree a dissolution. Green v. Kubik, 213 Iowa 763, 239 NW 589 (1931); Sime v. Malouf, 95 Cal App2d 82, 212 P2d 946 (1950).

There is statutory recognition of the desirability of liquidating a business in the corporate form when directors or shareholders are "deadlocked." Ill Rev Stat, 1963, ch 32, § 157.86;[6] Central Standard Life Ins. Co. v. Davis, 10 Ill2d 566, 141 NE2d 45 (1957).

In the Uniform Partnership Act (Ill Rev Stats 1963, c 106½ § 31), many grounds are provided on which dissolution may be obtained,[7] and an Illinois court has

---

the members of an association constitute a good ground for dissolving it at the instance of one or more of its members, especially where, in consequence thereof, the objects of the association have been defeated." Footnotes cite Fischer v. Raab, 57 How Pr (NY) 87; Willow Dip Lodge v. Wenzel, 94 Pittsb Leg J 271; Eury v. Merrill, 42 Ill App 193 (1891).

[6] The statute reads in partinent part as follows: "Courts of equity shall have full power to liquidate the assets and business of a corporation: (a) In an action by a shareholder when it is made to appear: (1) That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or (2) That the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose term has expired or would have expired upon the election of their successors; . . . ."

[7] Plaintiffs urge this court to declare the instant arrangement to be a partnership and thus subject to dissolution "by the express will of any partner when no definite term or particular undertaking is specified." Ill Rev Stats 1963, c 106½, § 31(b).

As set forth in the opinion, however, we believe that the application of the partnership label is not necessary to a decision in favor of dissolution, in view of the equitable power of the court to declare a business relationship at an end when the purposes of the relationship are being defeated by deadlock.

decreed dissolution of a partnership where such embittered relations existed between partners as to render it impracticable for them to conduct the business beneficially. Whalen v. Stephens, 193 Ill 121, 61 NE 921 (1901).

Thus, for a wide variety of forms of business, courts have been empowered to decree dissolution where disagreement producing stalemate was defeating the very objects of the business arrangement. We believe that the principle should be extended to a termination of the business arrangement in the instant case.

We find nothing which would prevent this court from ordering the sale of all beneficial interests in the land trust as such. The only possible impediment to this procedure is the prohibition against partition by a beneficiary, as laid down in Whitaker v. Scherrer, 313 Ill 473, 145 NE 177 (1924) and Aronson v. Olsen, 348 Ill 26, 180 NE 565 (1932). From these decisions it is argued that plaintiffs should not be allowed to achieve indirectly by way of the instant suit, what they could not procure directly.

However, an analysis of the reasons advanced in the Whitaker case shows why the indirect partition

---

It is true that in some situations and for limited purposes land trust beneficiaries may appropriately be classified as partners. In re Estate of Conover, 295 Ill App 443 (1938); Schumann-Heink v. Folsom, 328 Ill 321, 328 (1927); US Treasury Department Revenue Ruling 64–220.

Where the issue is dissolution of a business, however, the partnership analogy is imperfect in at least one important respect: a beneficiary in the usual land trust can get out of the arrangement by selling his interest freely, with the buyer being entitled to all his rights, Whitaker v. Scherrer, 313 Ill 473, 479 (1924); while a partner cannot transfer his status, even though he can sell his interest in partnership assets to a third party, without the approval of the other partners. Ill Rev Stats 1963, c 106½, § 18(g). Thus there is an escape available to dissatisfied beneficiaries which is not given to partners.

argument is not controlling of the instant case and also why the fact of deadlock negatives other solutions. First, there is the technical distinction that a partition is directed to the division of legal title to real property which would sever the individual interests to a tract of land (Ylonen v. Ylonen, 2 Ill2d 111, 117 NE2d 98 (1954)); while here a sale of the beneficial interests would be a mere transfer of personal property (Breen v. Breen, 411 Ill 206, 103 NE2d 625 (1952)), with the entity of the trust remaining intact. Thus, a judicial sale would not disrupt what is often considered to be a principal advantage of the land trust, and that is the ease of transferring individual interests thereunder without disturbing record title. Whitaker v. Scherrer, 313 Ill 473, 481, 145 NE 177 (1924).

Secondly, there is no prejudice to the present parties from the harm feared by the Whitaker court "if any beneficiary, however small his interest, would compel division or partition of the trust property" (page 481), because all beneficiaries here are equally involved in the deadlock.

By analogy, compare the distinction in remedies available to a minority shareholder and a 50% shareholder in the case of a corporation, even though a corporate shareholder, like a land trust beneficiary, has an alternate solution through the right to sell his shares. Thus, absent other controlling conditions, a minority shareholder cannot force a dissolution, but by statute where shareholders are "deadlocked," a court will order a liquidation. Ill Rev Stats 1963, c 32, § 157.86(a)(2).

Finally, the court in Whitaker saw its refusal to order a partition as a preservation of the purposes of the trust. But a failure to order a judicial sale in the instant trust would merely perpetuate the dead-

280

lock which is defeating, and if continued would surely prevent the accomplishment of those purposes.

■ In so far as the decree denies plaintiffs' prayer for dissolution of the management deadlock, it is reversed and the cause remanded with directions to hold a judicial sale of all beneficial interests in the trust with division of the proceeds in accordance with the rights of the parties under the trust agreement.

■ The decree dismissed the counterclaim wherein defendants had requested damages for trespass by the storage of the ice cream fixtures and for damage done by their removal. The decree found that "the acquisition by the plaintiff, Gust Regas, of certain fixtures was without objection by the other parties, and that only inconsequential damage was caused to the premises by the removal of these fixtures." We believe the record supports this finding of both the Master and the Chancellor and it is affirmed.

We come, then, to the dismissal of defendants' counterclaim for an accounting. In his report the Master found: "This record shows a pattern of the submission of annual written statements coupled with access to books and records. Defendants have at all times acquiesced in this procedure until the filing of the counterclaim. Defendants never at any time took exception to any of the items appearing in the written statements submitted to them. Defendants never at any time made a demand for an accounting."

A similar finding was incorporated into the decree. Consideration of the facts in more detail, however, discloses that there was a marked change in the business relationship among the four parties beginning in April, 1955. Prior to that time there had been consultation to some extent between Gust Regas and Danigeles, and between 1952 and 1955 the latter participated quite actively in the management of the property.

281

During that period, as found by the Master, "bills were referred to Danigeles for payment and he signed checks with bookkeeping entries being made by his son."

As stated earlier in this opinion, it was in April, 1955 that Gust Regas unilaterally terminated this cooperative method of carrying on the business, closed out the bank account, carried the business funds thereafter in his personal account, removed the books and records from the poolroom where defendants had had access to them, and thereafter kept them in his home. Gust notified Danigeles that his assistance in management would no longer be needed, substituted Spiros Regas for Danigeles as a signatory on the bank account, and in general blocked defendants from knowledge of facts about the business. In so doing, Gust Regas created a self-imposed fiduciary obligation of the highest order which, in our opinion, could not be satisfied by anything less than full disclosure of all his acts on behalf of the foursome.

The trial court appears to have reached its conclusion in regard to the accounting on two bases, neither of which withstands close scrutiny. The first basis— defendants' "access to books and records"—as we have pointed out, was ended in April, 1955. The second basis—the "annual written statements"—did not furnish defendants with the full information to which they were entitled and which would have been necessary to bar their right to accounting through acquiescence.

For example, the annual statements sent by Gust to defendants contained only a lump-sum item covering "income from rents." Defendants were never told who the tenants were, what space they occupied, what rent was paid by each, nor for what term. And during the period we are discussing defendants were deprived of the means of ascertaining this informa-

282

tion, or the details of expenditures, etc. In this, and in all other ways, plaintiffs had made it impossible for defendants to verify so much as a single item on the annual statements.

"Acquiescence" of this character, when the entire matter became the subject of bitter litigation within a matter of months after April, 1955, does not seem to us to be such as would deprive defendants of their right to an accounting from plaintiffs.

▪ After April, 1955 all of the "annual written statements" were sent to defendants while this litigation was pending. No more than two of these statements could have been furnished prior to the filing of defendants' counterclaim for an accounting. Under these circumstances, the filing of the counterclaim, in itself, constituted an adequate and timely demand.

The part of the decree which denies the prayer of the counterclaim for an accounting is reversed, and the cause is remanded for the taking of such an accounting for the period beginning April, 1955.

Further, in the light of our conclusions, the provision in the decree taxing all costs against defendants must also be reversed.

The cause is remanded for further proceedings not inconsistent with this opinion, including a reassessment of costs.

Affirmed in part reversed in part and remanded with directions.

DRUCKER and McCORMICK, JJ., concur.