## METRO U. S. CONSTRUCTION CORPORATION v. JAMES R. RILEY.

232 N. W. 2d 208.

July 11, 1975—No. 44905.

---

*Mastor & Mattson* and *William G. Bale,* for appellant.

*O'Connor & Hannan* and *Joe A. Walters,* for respondent.

Heard before Otis, Peterson, Todd, MacLaughlin, and Yetka, JJ., and considered and decided by the court en banc.

MacLaughlin, Justice.

This is an appeal from a judgment of the trial court denying plaintiff's request that the court dissolve a partnership between plaintiff and defendant pursuant to Minn. St. 323.31.[1] We affirm.

Plaintiff, Metro U. S. Construction Corporation (Metro), a Minnesota corporation, and defendant, James R. Riley, entered into a written partnership agreement on January 31, 1969. The partnership, known as Metro-Riley Associates, was to be in existence for a term of 25 years and was formed for the purpose of constructing and operating a 4-building, 96-unit apartment complex in the village of Plymouth, Hennepin County, Minnesota.

---

[1] Minn. St. 323.31 reads in part as follows: "On application by or for a partner the court shall decree a dissolution whenever:

\* \* \* \* \*

"(3) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business;

"(4) A partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him;

"(5) The business of the partnership can only be carried on at a loss;

"(6) Other circumstances render a dissolution equitable."

The original partnership agreement provided that Metro would make an initial contribution of $26,000 and that Riley, who would make no cash contribution, would assume duties as general superintendent of the apartment project with responsibility for the overall supervision of construction. The agreement also provided that profits, losses, and distributions on liquidation would be shared 55 percent by Metro and 45 percent by Riley. Metro assumed the duty of arranging the necessary financing for the project and agreed to loan to the partnership the necessary working capital. The partnership purchased the land on which the project was to be built from Metro under a contract for deed for $100,000, plus 7 percent interest, with installments due beginning July 1, 1970. Interim and permanent financing was obtained from outside sources.

Construction of the apartment complex was substantially completed by the fall of 1969, and by June 1970 the occupancy rate for the complex was 92 percent. In early 1971, however, the occupancy rate fell significantly due to the construction of a highway interchange which impaired access to the apartment complex. The occupancy rate rose after the completion of the interchange and was at 99 percent at the time of trial, having averaged 96 percent during the 12 months prior to trial.

During the course of the partnership, several disputes arose which resulted in two lawsuits between the partners. Both suits were settled on June 1, 1971, when the partners entered into a written settlement agreement. Under the terms of the settlement agreement the partnership agreement was amended to provide, among other things, that the initial capital contributions of the partners would be set at zero and that Metro would make a loan of $125,000 to the partnership to be known as the "Metro Debt," which was due and payable by the partnership to Metro on June 1, 1981. The amended partnership agreement contained specific provisions concerning additional loans to the partnership by the partners.

"* * * After Metro has discharged this obligation to loan additional monies as aforesaid [the $125,000] * * *, the partner who is willing to deliver to the partnership additional cash to meet the needs of the partnership shall have the right, but not the duty, to deliver the cash in excess of that contributed by Metro * * * as a loan to be repaid with interest * * *. If the loan is made by Metro, the amount of additional cash paid to the partnership shall be added to and increase the sum hereinafter referred to as the 'Metro Debt' and repayment of any such increase to the 'Metro Debt' as aforesaid shall be on the same terms and provisions as hereinafter provided for payment of the 'Metro Debt'. * * * The Metro Debt * * * shall, together with accrued interest, be due and payable by the partnership to Metro June 1, 1981."

The amended partnership agreement also provided that until repayment of the Metro Debt, Metro would be entitled to—

"* * * receive and enjoy all 'excess depreciation' available for income tax purposes to the extent permitted by law and shall elect such maximum depreciation rates for the partnership to be applied for the property as is permitted by law * * *. * * * 'Excess depreciation' shall mean the depreciation remaining to be used by a partner after the application of the maximum depreciation established aforesaid to the partnership taxable net income so to reduce the partnership's taxable net income to zero."

After the settlement agreement of June 1, 1971, disputes continued between the partners. These disputes primarily concerned the means of obtaining additional funds for the partnership and the priority of payment of partnership obligations. Metro believed that the partners should contribute money individually according to their proportionate shares. Riley, on the other hand, wanted the partnership to borrow necessary funds in the partnership name. Because of these continuing differences, Metro commenced this action on March 15, 1972, seeking to dissolve

the partnership. At about the same time, Riley agreed that Metro could assume complete control of the partnership business, and since that time Riley has not involved himself in the conduct of the business.

Beginning in April 1972, Metro loaned a total of $73,000 to the partnership over and above the $125,000 previously advanced. At the time, Riley insisted that the partnership borrow the needed funds from a financial institution. Metro, however, insisted that each partner provide whatever funds were needed according to their partnership interest. Riley was either unable or unwilling to provide the money to the partnership in that manner, and as a result the $73,000 was advanced to the partnership by Metro.

The trial court found that, as of July 31, 1973, the partnership business had incurred a deficit of $449,107. Approximately $250,000 of the deficit represented accumulated depreciation calculated by using the double declining balance method over a term of 33 1/3 years. Almost all of the depreciation was used by Metro on its income tax returns as it was permitted to do by the amended partnership agreement. Also included in the deficit was $53,-000 in accrued interest payable on the Metro Debt, the contract for deed, and a mortgage note, $45,000 in arrearages on the payments due on the land on contract for deed, and the $73,000 loaned to the partnership by Metro beginning in April 1972.

The trial court found that the market value of the apartment project as of the date of trial was $1,550,000,[2] and that in the calendar year 1973 the project would generate a gross income of approximately $225,000. The trial court further found that Metro had failed to sustain its burden of proof that the partnership business could not reasonably be carried forward; that Metro had failed to sustain its allegation that the business of the partnership could be carried on only at a loss by reason of dissension between the parties; and that Metro had failed to prove that

[2] As of July 31, 1973, the apartment building and land were shown on the partnership books at $1,016,184.

dissolution of the partnership would be equitable, fair, or just.

At oral argument in this court, Metro narrowed the issue on appeal to one question: Is the $73,000 loaned by Metro to the partnership repayable by the partnership upon Metro's demand or is the $73,000 to be considered an addition to the so-called "Metro Debt" and therefore not due and payable until June 1, 1981? Metro argues that the $73,000 was a loan payable upon demand; that the partnership does not have the cash to repay the loan; that the partners are unable to agree as to how to obtain the funds necessary to repay the loan; and that, as a result, because of the partners' dissension and inability to agree as to the source of needed capital, the "business of the partnership can only be carried on at a loss," and the partnership should be dissolved. Minn. St. 323.31(5).

The trial court found that "[u]nder the provisions of the 1st Amendment [to the partnership agreement], the $73,000 is due and payable, together with accrued interest, on the same day as the original Metro Debt of $125,000, namely, on June 1, 1981."

We have reviewed the record and conclude that the trial court's finding of fact on this issue is correct. The amended partnership agreement states:

"* * * [T]he partner who is willing to deliver to the partnership additional cash to meet the needs of the partnership shall have the right, but not the duty, to deliver the cash in excess of that contributed by Metro [i.e., the $125,000] * * * as a loan * * *. If the loan is made by Metro, the amount of additional cash paid to the partnership shall be added to * * * the 'Metro Debt' and repayment * * * shall be on the same terms and provisions as * * * the 'Metro Debt'."

Metro argues that, even if it does appear from this language that the funds advanced by it should be part of the Metro Debt, Metro made clear in a letter to Riley, dated April 21, 1972, that the advance was not made "willingly," but was made under protest, and was not to be considered a part of the Metro Debt. We

disagree. The letter, after referring to this legal action pending between the partners, states in principal part:

"* * * You are aware that the partnership has had insufficient cash funds to pay its debts. During the pendency of our suit against you, to the extent necessary in order to preserve the assets of the partnership, this corporation plans to loan money to the partnership. The extent of these loans will depend upon the cash flow received from the apartment building, the principal asset of the partnership. This corporation will be making these loans under protest and without establishing any obligation or liability to continue them. In other words, we will reserve the right not to make such loans at any time."

There is no reference whatever in the letter to the partnership agreement or to the fact that the funds to be advanced are not to be considered a part of the Metro Debt as set out in that agreement. Nor is there any declaration in the letter that the funds to be advanced by Metro were to be payable upon demand, as contrasted with the Metro Debt which is payable on June 1, 1981. The language of the amended partnership agreement is clear and specific, and we are not persuaded that it was altered in any way by the letter of April 21, 1972. Therefore, we hold that the trial court correctly determined that the advances made to the partnership by Metro, beginning in April 1972, are a part of the Metro Debt, as defined in the partnership agreement, and are due and payable on June 1, 1981. Consequently, we need not decide whether the partnership would be operating at a loss, within the meaning of Minn. St. 323.31(5), if the $73,000 was now due and payable by the partnership.

While the resolution of this issue disposes of the appeal, we believe the trial court, in its memorandum, fairly stated the practical financial status of the partnership as of that time:

"* * * Even though the partnership business has suffered substantial losses on paper, great benefit has been derived by Metro in its use of these losses for income tax purposes.

"While it is not possible to predict how this partnership business will perform in the future, there is substantial evidence that it can generate a profit. On a cash flow basis, the apartment project may have already begun to generate a surplus, however small. When viewed in the context of today's rapidly rising real estate market, this apartment project has considerable value as an income producing investment. The depreciation losses shown for accounting and tax purposes do not reflect the actual appreciation of the market value of the property nor the increased cost of replacement of the buildings. While the actual market value of the property may best be determined by a sale, the undisputed evidence at trial indicates that it is in the neighborhood of $1,550,000. Comparing the present value of the property with the past deficits indicates that these deficits have been substantially made up by the appreciation of the value of the property. Coupled with the tax benefits to the partners, this apartment project has performed very much as the partners intended it to."

The judgment of the trial court is affirmed.