SHELDON J. MANDELL et al., Plaintiffs-Appellees, v. CENTRUM FRONTIER CORPORATION et al., Defendants-Appellants.

First District (1st Division)   Nos. 80-216, 80-224, 80-710 cons.

Opinion filed June 23, 1980.

Lionel G. Gross, Aaron E. Hoffman, and Freda J. Levenson, all of Altheimer & Gray, of Chicago, for appellants.

Richard G. Schultz and Kenneth W. Sullivan, both of Foran, Wiss & Schultz, of Chicago, for appellees.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiffs, Sheldon J. Mandell, Howard Mandell, Jerome W. Mandell and Norman Mandell, filed an action for dissolution and an accounting of the limited partnership, Frontier Investment Associates (Frontier), which they as limited partners and defendants, Centrum Frontier Corporation (Centrum) and William P. Thompson, as general partners had formed on September 30, 1976. On November 14, 1979, the circuit court of Cook County after a hearing entered judgment dissolving the partnership and ordering the assets of the partnership liquidated and the proceeds used to discharge the liabilities of the partnership and to settle the accounts of the partners. Defendants appeal from that judgment and also appeal from (1) the trial court's order of December 20, 1979, denying defendants' motion for reconsideration and setting the date for a judicial sale of the partnership property, and (2) the trial court's order of January 16, 1980, determining the manner in which the judicial sale of the partnership property would be conducted. The trial court found that there was no just reason for delaying enforcement or appeal of these three orders.

Defendants contend that (1) the trial court erred in decreeing dissolution of Frontier, (2) even if dissolution was proper, the trial court erred in ordering a judicial sale of the sole partnership asset, (3) the trial court erred in hearing and disposing of this matter on an emergency basis, and (4) the trial court was misused as an instrumentality of a freeze-out.

Frontier's sole asset was a 56-story apartment building (Park Place) containing 901 units located on Chicago's lakefront at 655 West Irving Park Road. The building has a 650-car garage, a swimming pool, cabanas, tennis courts, exercise room, party suites and space for retail stores.

In the summer of 1976, defendant Thompson knew that the Department of Housing and Urban Development (HUD) had a mortgage on Park Place which was in default. Paul Reynolds, the then-owner of

Park Place, agreed to sell Park Place to Thompson and a group to be formed by Thompson.

Thompson approached plaintiff Sheldon Mandell and discussed the formation of a limited partnership which would purchase the property. An agreement was reached whereby Reynolds deeded the property to the limited partnership created by the purchasers in consideration for $100,000. Reynolds was paid $2,000 on September 29, 1976, and the $98,000 balance was to be paid when the partnership worked out an agreement with HUD enabling the partnership to pay the mortgage from the proceeds of current operations. The partnership agreed with Reynolds that it would not record the quitclaim deed until the partnership completed the negotiations with HUD within a specified period of time and, if the negotiations were unsuccessful, the $98,000 would not be paid and title would revert to Reynolds. The partnership subsequently paid Reynolds the $98,000.

When the $2,000 was paid to Reynolds in exchange for the quitclaim deed, a limited partnership was formed. The partnership agreement provided that the purpose of the partnership was to acquire, own, develop, lease, manage and sell the apartment building, which at the time was called Frontier Towers. The general partners, who are defendants in this action, are Thompson and Centrum. Thompson is the sole shareholder and president of Centrum. The partnership agreement provides that the two general partners own 10 percent of the profits and losses from the partnership and are to make no capital contributions or loans to the partnership. The limited partners are the four plaintiffs in this action. The limited partners together made a $150,000 capital contribution and were to receive 90 percent of the profits and losses. The partnership agreement provided that the limited partners were to make an additional capital contribution of $900,000 to pay a portion of the mortgage delinquency and the operating expenses of the partnership. The limited partners also agreed to loan the partnership up to $200,000 if loans were necessary to pay the operating expenses of the partnership. The partnership agreement further provides that neither the general partners nor the limited partners can sell the partnership assets without the approval of the other partners.

Thompson testified that the partnership planned to maintain the property as rental units and Thompson would make the project profitable by increasing the gross rentals and reducing the operating expenses. Thompson presented to the limited partners two written cash flow projections. The first document reflected that beginning in the calendar year 1978 and in each year through 1985 the building would operate at a positive cash flow of $205,520. The second document which Thompson gave the limited partners contained a revised projection of the cash flow

reflecting a positive cash flow of $719,883 in each of the calendar years 1978 and 1979. This document projects that in each of the calendar years 1980 and 1981 the positive cash flow would be $205,520 and that the positive cash flow would be $103,133 in each of the calendar years 1982 through 1985.

The partners were unable to arrange a program with HUD whereby the limited partners would obtain possession in consideration for an agreement to pay the arrearages on the existing mortgage within a specified period of time. Instead, the partners sought to obtain a loan from the Continental Illinois National Bank (Continental) to pay the $20,000,000 owed HUD.

In late 1977 the partnership first contacted Continental and on April 18, 1978, Continental issued a 30-day commitment to make a $22,000,000 loan. The commitment provided for an initial disbursement of $20,114,790, and the balance of $1,885,210 to be distributed if requested by the partnership. The period of the loan was to be three years. The annual interest rate to be paid on the outstanding balance of the loan was two percent over the floating prime rate of Continental. The commitment provided the loan would not be made unless the partnership paid HUD $1,000,000 out of its own funds and pledged $1,600,000 in securities with Continental to guarantee the $22,000,000 loan. The stated purpose of the loan was for the "acquisition of the premises and possible condominium conversion and sales program." The commitment provides the borrower "may, pursuant to the terms hereof and with the prior written consent of the Bank, convert the Premises to condominium ownership." It states that the borrower "may (a) sell [the units as condominiums] or (b) sell the entire Premises to an entity pursuant to a transaction." The commitment also provides that Continental has the right to accelerate the maturity date if the borrower does not deliver notices of intent to convert to the tenants of the property within 13 months after the initial disbursement of the loan proceeds.

The limited partners told Thompson they would agree to the Continental loan if Thompson would agree to amend the partnership agreement to specify that Thompson could not convert without the approval of the limited partners. After several communications and meetings between Thompson and the limited partners, Thompson agreed to the provisions of the amendment.

The amendment to the partnership agreement states in pertinent part that:

> "§11.9(a) * * * a General Partner may not take any of the following actions without the consent of the majority interest of the Limited Partners
>
> * * *

(ii) sell any material portion of the Premises or this Partnership's other tangible assets, or file a condominium declaration with respect thereto."

The day following the execution of the amendment to the partnership agreement the limited partners complied with the requirements of the loan commitment by making an additional capital contribution to the partnership in the amount of $1,000,000 and loaning $1,600,000 in securities to the partnership, which pledged the securities with Continental. The Continental loan was then disbursed.

The monies owing HUD were paid from the proceeds of the Continental loan and the partnership took possession of the property on April 28, 1978. City Centrum Management Corporation (City Centrum) assumed the management of the property and contracted with the partnership to receive a management fee of 5 percent of the gross income of the building. Thompson is the sole shareholder and president of City Centrum.

Shortly after acquiring possession of the property, the general and limited partners commenced monthly meetings to review the operations of the property and the budget. At each meeting Thompson produced documents reflecting the prior month's actual income and expenses of the operation of the building and he would compare these figures with the income and expenses which he had budgeted for that month. The budget was an estimate of the income and expense of the following month's operation and was prepared each month by Thompson and his management company.

During the period from May 1, 1978, when operations began, through September 30, 1979, the actual cash loss sustained exceeded the budgeted cash loss in the amount of $1,306,730. In all but two months during that period the management company failed to meet the projected budget cash flow.

Prior to July 31, 1979, the cash losses were paid each month by Continental, which would disburse an amount equal to the monthly deficit and increase the loan balance by that amount. Continental paid the losses in this way until July 31, 1979, when the loan balance increased to $22,000,000. Commencing August 1, 1979, the cash losses were to be paid by liquidating the $1,600,000 in securities pledged at Continental to satisfy the unpaid interest.

As the cash losses continued and the limited partners realized their $1,600,000 in pledged securities was in jeopardy, they began intensive efforts to sell the property. As an alternative to selling the property to a prospective developer, Thompson presented a proposal to sell whereby he would form a new entity called XYZ Corporation of which he would be the principal owner. Thompson proposed the limited partnership

would receive a note to be paid after XYZ Corporation converted the units and paid the indebtedness owed Continental. Thompson explained the transaction would result in capital gain to the partnership. Sheldon Mandell rejected the proposal, calling it a sham transaction and a tax gimmick.

In the summer of 1979, when the loan was almost fully funded and Continental soon would begin liquidating the securities pledged by the limited partners to pay the deficiencies, Sheldon Mandell asked Thompson if he would ever agree to sell the property. Thompson responded that he would consent to a sale if the price was $35,000,000.

Sheldon Mandell then negotiated a contract to sell the property for $35,175,000 to purchasers referred to as the Miller Group. In late July or early August of 1979, after the sale documents had been prepared, the limited partners and their attorneys met with Thompson and his attorneys to sign the Miller contract. Thompson refused to sign, objecting to the Miller contract because it did not permit him to participate in the conversion of the units. At the meeting, Sheldon Mandell, on behalf of the limited partners, then offered to pay Thompson 10 percent of the profit which Thompson would realize on the sale to the Miller Group. Mandell stated the limited partners would purchase Thompson's 10 percent interest for $1,000,000. Thompson refused to sell.

On September 27, 1979, the limited partners filed a three-count complaint for dissolution of the limited partnership, an order decreeing a sale of the partnership asset, and damages, alleging that "the business of the limited partnership can only be carried on at a loss." Count II seeks dissolution, alleging the circumstances render dissolution of the partnership to be equitable. Count III charges the general partners with mismanagement and breach of their fiduciary obligations to the limited partners and seeks damages and an accounting. Count III is still pending in the trial court.

On October 9, 1979, plaintiffs moved for an emergency hearing on that portion of the complaint seeking dissolution of the limited partnership and sale of the partnership property. Defendants objected to the motion, representing that Thompson was in the process of negotiating a contract to sell the property which would be formalized within a week's time. The trial court granted defendants' request to postpone the hearing to allow defendants to finalize their contract and for the purpose of determining whether an emergency existed. The cause was continued to October 16. On October 16 the trial court set the matter for hearing on October 30, 1979.

William Thompson testified as to certain documents prepared by the general partners reflecting the income and expenses of the partnership. Among the documents identified by Thompson was an analysis of the

cash flow of the partnership from the time it obtained possession of the property on April 28, 1978, through September 30, 1979. The document, which was prepared by defendants October 18, 1979, reflects that during the 17 months of the operation of the partnership, the partnership suffered a total cash loss of $2,123,825. Ralph Nach, a certified public accountant, testified that he analyzed the financial records identified by Thompson. Nach computed the average daily cash loss during the 17-month period to be $4,100 per day.

On November 1, 1979, defendants filed a counterclaim seeking an order requiring plaintiffs to permit the conversion of the units to condominiums, alleging that under the partnership agreement plaintiffs were obligated to agree to the conversion and that their refusal to consent constituted a breach of the partnership agreement.

Jared Shlaes and John Marling, real estate appraisers, testified for defendants. Both testified that Park Place was suitable for conversion to condominiums. Marling testified that a developer would pay $29,000,000 to purchase Park Place and that if Park Place's units were to be sold as condominiums a $48,000,000 profit could be realized.

On November 14, 1979, the court rendered its decision, finding that the business of the limited partnership could only be operated at a loss and that immediate or future possibilities did not indicate any operational or economical chance that would alter this conclusion. The trial court also found that the structure of the partnership agreement resulted in a deadlock where neither the general nor the limited partners could sell the assets of the partnership without the consent of the other. Because the partnership was incurring huge daily losses which could not be eliminated without the consent of both the general and the limited partners, the trial court ordered dissolution of the partnership and liquidation of the partnership assets by judicial sale or otherwise. The trial court dismissed defendants' counterclaim and ordered a status report to be held on December 14, 1979, to give the parties an opportunity to agree to a resolution of their differences. The court ruled that if the parties failed to reach an agreement by December 14, a judicial sale would be held on January 18, 1980.

Defendants made a motion for reconsideration of the trial court's order of November 14, 1979. The December 14 status date was continued to December 17. On December 20, 1979, the trial court denied defendants' motion for reconsideration of its order of November 14, 1979, and continued the judicial sale to March 4, 1980. The court also set the matter for status on January 3, 1980, for the purpose of determining the method of advertising and the details and terms of the sale. On January 16, 1980, the court entered an order setting forth the terms and conditions of the judicial sale. The order required advertisements to be placed twice

weekly in the Chicago Tribune, the Wall Street Journal, the New York Times, the Los Angeles Times and the Washington Post for six consecutive weeks. A total of $22,500 was expended for the advertisements in the various newspapers. Notices also were required to be posted at the Daley Center and the State of Illinois Building in Chicago, Illinois.

On February 25, 1980, the plaintiffs filed a December 10, 1979, disbursement schedule prepared by the general partners and forwarded to Continental, reflecting that the November 1979 interest payments in the amount of $158,401 had not been paid. The court received two letters from Continental to the partnership. The first letter, dated December 24, 1979, informed the partnership that as of December 1, 1979, interest payments in the amount of $321,902 were past due. The second letter, dated February 15, 1980, informed the partnership that for the period November 1, 1979, to February 1, 1980, $546,668 in interest was unpaid and past due. Continental advised the partnership that it would wait until after the sale date of March 4, 1980, before taking legal action upon the defaulted loan, but if the sale was not successfully consummated on March 4, 1980, it would promptly pursue its rights to foreclose and enforce its rights against the pledged securities.

Two prospective bidders attended the March 4, 1980, judicial sale— Steven Goldman and Sheldon Mandell on behalf of the 655 Limited Partnership, a partnership whose members consisted of plaintiffs herein. Before the sale commenced, the court stated it would not confirm a bid of less than $30,000,000. Plaintiffs' counsel objected to the $30,000,000 base. Goldman stated he would not bid $30,000,000. The court proceeded with the sale. Sheldon Mandell bid $30,000,000 on behalf of the 655 Limited Partnership and posted cashiers' checks in the amount of 5 percent of the bid. The court confirmed the $30,000,000 sale price. After proceedings before this court and before the Supreme Court of Illinois on April 2, 1980, this court stayed the closing of the sale, conditioned upon defendants posting a $1,000,000 bond on or before April 9, 1980. Defendants did not post the bond and the sale was closed April 16, 1980.

Defendants first contend that the trial court erred in ordering the partnership dissolved because (1) it was not proved at trial that the partnership can only be carried on at a loss, and (2) deadlock was improperly relied upon in decreeing the dissolution.

Defendants argue that although the evidence showed that the partnership had suffered past losses, there was no indication that the partnership would be without possible future profit. The defendants argue further that the trial court's finding that the partnership could only be carried on at a loss was in error, because the trial court (a) refused to consider huge tax benefits which the plaintiffs enjoyed, (b) failed to

consider Park Place's great appreciation in value and development potential, and (c) failed to consider that the partners had anticipated major operating losses.

Section 32(1)(e) of the Illinois Uniform Partnership Act (Ill. Rev. Stat. 1977, ch. 106½, par. 32(1)(e)) provides:

"(1) On application by or for a partner the court shall order a dissolution whenever:

* * *

(e) The business of the partnership can only be carried on at a loss."

■■ A court will dissolve a partnership when it is reasonably certain that the business of the partnership cannot be carried on at a profit. (*Willis v. Chapman* (1896), 68 Vt. 459, 35 A. 459.) A history of past losses is an indication that future profits are not to be expected. *Wallace v. Sinclair* (1952), 114 Cal. App. 2d 220, 250 P.2d 154.

Defendants rely on *Metro U.S. Construction Corp. v. Riley* (1975), 304 Minn. 474, 232 N.W.2d 208, to support their argument that dissolution was improper. In that case, the court affirmed the trial court's refusal to grant a dissolution of a partnership. There, although the partnership business had incurred a deficit, the court found that because a loan payable by the partnership to one of the partners was not a demand note but rather one payable some years later, the partnership was not such that it could only be operated at a loss.

In the instant case, it is clear that the partnership suffered losses during all but two months of the 17-month period prior to the filing of this suit. Defendants present no argument that any item constituting a portion of the partnership losses here should not be considered a deficit of the partnership, as was the circumstance in *Metro*.

■■ An analysis of the cash flow of the partnership for the period of time from May of 1978 to October of 1979, prepared by Thompson 12 days before the hearing in this cause, reflected an aggregate cash loss of $2,123,825 during that 17-month period, an average of $4,100 per day. The losses were increasing at the time of the hearing, for the floating interest rate had increased to 17½ percent and the monthly interest payments had increased from $187,351 in May of 1978 to $272,708 in September of 1979. Prior to the sale of Park Place, plaintiffs filed with the trial court letters to the general partner from Continental reflecting the losses during the three-month period from November 1, 1979, to January 31, 1980, were $546,668, a loss of $5,878 per day. Because the partnership had a negative cash flow during 15 months of the 17 months prior to filing this suit and the losses continued even after the trial court had ordered Park Place sold, we find that the trial court properly decreed dissolution

of the partnership on the ground that Frontier could only be carried on at a loss.

■■ Defendants argue further that the trial court erred when it refused to consider the tax benefits plaintiffs received by virtue of their participation in the partnership. The substance of defendants' argument is that because the partnership never operated at a real economic loss as to the individual plaintiffs, the partnership should not have been dissolved. We disagree. The focus is to be placed on the losses of the partnership as an entity and not the losses of the individual partners. We find that the trial court did not err in refusing to consider any tax benefits received by plaintiffs personally because of their participation in the partnership.

Defendants also argue that because the ultimate purpose of the partnership included the future development and sale of Park Place, the trial court erred when it failed to consider that the partnership would be enormously profitable if Park Place was sold as condominiums. We disagree. Even assuming that the business of the partnership was to sell Park Place and that such a sale would be enormously profitable, under the existing circumstances conversion was not possible. Section 11.9 of the partnership agreement prohibited the general partners from converting without the approval of the limited partners and the limited partners refused to agree to Thompson's conversion proposal. Because conversion was not possible under the existing circumstances, we find that the trial court did not err in refusing to consider whether or not the partnership would be profitable if Park Place was converted to condominiums.

Defendants also rely on *Metro U.S. Construction Corp. v. Riley* to support their argument that Park Place's appreciation in value offset the partnership's operating losses and that therefore the business of the partnership was not such that it could only be carried on at a loss. In *Metro*, the court found that because the appreciation of the value of the property made up for the past deficits of the partnership, the partnership could not be dissolved on the ground that it could only be operated at a loss. However, *Metro* is distinguishable from the case at bar. There the court found that there was substantial evidence that the partnership business could generate a profit in the future. In the instant case there is no possibility of future profit for the partnership business. We find that the trial court did not err when it failed to consider whether the appreciation of the value of Park Place offset its operating losses.

Defendants further argue that plaintiffs are estopped from obtaining a dissolution because the losses of which plaintiffs complained were fully anticipated, produced tax benefits for plaintiffs and were a result of plaintiffs' opposition to Park Place's conversion to condominium. We disagree. The partnership could only be operated at a loss, and even

assuming the partnership losses were fully anticipated by plaintiffs, that circumstance is of no consequence. In addition, we find it of no consequence that plaintiffs received tax benefits because of the partnership losses. We also do not find that the partnership losses were a result of plaintiffs' opposition to the conversion of Park Place to condominium. Plaintiffs had no duty or obligation to agree to the conversion. Even assuming conversion would generate profits to the partnership, it cannot be said that plaintiffs are estopped from obtaining a dissolution of the partnership where plaintiffs had no duty or obligation to agree to the conversion.

For the foregoing reasons, we find that the trial court did not err in dissolving the partnership on the ground that the partnership could only be carried on at a loss.

Defendants next contend that the trial court erred in also basing dissolution of the partnership on the ground that there existed a deadlock between the general partners and the limited partners. The trial court found that where neither the general partners nor the limited partners could sell or convert without the consent of all the partners, a deadlock existed which rendered operation of the partnership totally ineffective. Even though we have concluded that dissolution was proper on the ground that the partnership could only be carried on at a loss, and therefore it is not necessary for us to determine whether the trial court acted properly in basing dissolution of the partnership on the ground that the general partners and the limited partners were deadlocked, we find that the trial court properly based dissolution of the partnership on both grounds.

■■■ When the purposes of a business relationship are being defeated by deadlock, a court can declare the business relationship at an end. (*Regas v. Danigeles* (1965), 54 Ill. App. 2d 271, 203 N.E.2d 730.) Dissolution of a partnership is proper where relations existing between partners render it impractical for them to conduct business beneficially. *Whalen v. Stephens* (1901), 193 Ill. 121, 61 N.E. 921.

■■ In the instant case, Frontier's purpose as stated in the partnership agreement was "the acquisition, ownership, development, leasing, management and sale" of Park Place. Holding the building as rental property was resulting in daily losses to the partnership. A sale of Park Place appeared attractive to both the limited partners and Thompson. However, the parties could not agree as to whether to sell the property to a third-party developer or to sell the units as condominiums. By virtue of the amendment to Section 11.9 of the partnership agreement, the general partners could not convert Park Place to condominiums without the consent of a majority of the limited partners, and the limited partners refused to agree to a conversion proposal. The partnership agreement

provided that partnership assets could not be sold without the approval of all the partners, and the general partners refused to agree to a sale of Park Place to a third party unless Thompson could participate in any future conversion of the property. Because only a sale of Park Place would result in profit to the partnership, the trial court did not err when it also based dissolution of the partnership on the ground that deadlock existed between the two groups of partners.

Defendants' second contention is that even if dissolution was proper, the trial court erred in ordering a judicial sale of Park Place.

■■ Unless the partnership agreement provides otherwise or all partners agree otherwise, the established procedure in winding up a dissolved partnership is to convert its assets into cash by sale, discharge its liabilities and distribute surplus, if any, to its members. (*Polikoff v. Levy* (1971), 132 Ill. App. 2d 492, 270 N.E.2d 540.) "Where the [partners] cannot agree on the method of sale at dissolution, a public judicial sale is the only available method of conversion of the assets." *Polikoff*, 132 Ill. App. 2d 492, 499.

■■ Here, the trial court allowed the parties every opportunity to sell Park Place without the need for a judicial sale. When no sale without court direction was probable, the court ordered a judicial sale of Park Place. Because a judicial sale of business property is an ordinary and traditional method of final settlement of a business relationship (*Polikoff*, 132 Ill. App. 2d 492, 499), we cannot find that the trial court erred in ordering Park Place sold at a public judicial sale. Failure to order a judicial sale in the instant case would merely perpetuate the deadlock (*Regas v. Danigeles* (1964), 54 Ill. App. 2d 271, 280-81), and result in further losses to the partnership. In addition, we cannot find that defendants were in any way prejudiced by the trial court's order decreeing a judicial sale of Park Place. Defendants possessed an opportunity equal to that of plaintiffs to purchase the property at the judicial sale and were not excluded from their share of the proceeds of the sale.

■■ Defendants' third contention is that the trial court erred in hearing and disposing of this matter on an emergency basis because defendants were denied an opportunity to take discovery which would have uncovered certain correspondence, diaries and other materials. However, we first note that counsel for defendants did not object to the expedited schedule of the matter until after the hearing. In addition, defendants' claim that they were denied the opportunity to take discovery is without any basis. On October 9, 1979, the trial court ruled that the matter would be scheduled for hearing prior to October 22, 1979, in the event the court concluded a hearing was required. Defendants' counsel did not file notice to depose plaintiffs until October 31, 1979. The parties arranged for the depositions to be taken November 5, 1979. However, defendants'

counsel elected not to proceed with the depositions. If defendants' counsel had proceeded with the depositions, he could have sought to obtain the correspondence, diaries and other materials which defendants now assert were relevant to this cause. In view of the foregoing and the fact that the partnership business was sustaining substantial losses with each passing day, the trial court properly determined that this case should have proceeded on an expedited schedule.

Defendants' final contention is that the trial court was misused as an instrumentality of a freeze-out. It is well established law in Illinois that a fiduciary relationship exists between partners. (*Bandringa v. Bandringa* (1960), 20 Ill. 2d 167, 170 N.E.2d 116; *Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 120 N.E.2d 546; *Grossberg v. Haffenberg* (1937), 367 Ill. 284, 11 N.E. 359; *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805; *Babray v. Carlino* (1971), 2 Ill. App. 3d 241, 276 N.E.2d 435.) Partners owe each other the duty to exercise the highest degree of honesty and good faith in their dealings and in the handling of partnership assets. (*Babray v. Carlino*.) A partnership is not terminated upon dissolution, but continues until the winding up of the partnership affairs is completed. Ill. Rev. Stat. 1977, ch. 106½, par. 30; *Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 394 N.E.2d 380.

In the case at bar, there is no allegation that plaintiffs breached any fiduciary duty owed defendants when they filed their complaint requesting dissolution and a judicial sale of Park Place or when they bought Park Place at the subsequent judicial sale. Because daily losses were being incurred by the partnership, plaintiffs sought dissolution. After ordering the partnership dissolved, the trial court also ordered a judicial sale of the property which was subsequently conducted according to procedures which would insure fairness. Notice of the judicial sale appeared in five major newspapers for six consecutive weeks, as well as being posted at the Daley Center and the State of Illinois Building in Chicago, Illinois. Although only two prospective bidders attended the sale and only one of the two made a bid, the $30,000,000 price paid to purchase Park Place cannot be said to be below its market value in view of the fact that one of defendants' own experts testified that a developer would pay $29,000,000 to purchase the property.

Defendants rely on *Soderstrom v. Kungsholm Baking Co.* (7th Cir. 1951), 189 F.2d 1008, and *Flint v. Codman* (1924), 247 Mass. 463, 142 N.E. 256, to support their argument that the end result of the dissolution of the partnership and the subsequent judicial sale of the partnership asset to plaintiffs constituted a "freeze-out" of defendants. We find these cases are distinguishable. In *Soderstrom* the court found that plaintiff was entitled to a 10-percent interest of a business where a corporation in

which plaintiff had a 10-percent interest was dissolved and its assets conveyed to a partnership of which plaintiff had a 10-percent interest, and then later wrongfully transferred to another corporation in which plaintiff held no interest. *Flint* involved a situation where a majority of partners voted to sell the assets of the business to themselves, thereby effectively excluding the minority partners from any of the fruits of the concern. Defendants here were not excluded from their interest in the partnership. Defendants are entitled to their proportionate share of the proceeds of the sale.

■■ Here, the dissolution of Frontier, the trial court's order decreeing a judicial sale of the real estate, and the procedures followed in conducting the judicial sale were all proper. The mere fact that plaintiffs were the purchasers at the sale does not indicate that the dissolution and subsequent sale were merely a device to exclude defendants from the business. In addition, we again note that defendants had an opportunity equal to that of plaintiffs to purchase Park Place at the sale. In every dissolution of a partnership where a judicial sale follows, there is a possibility that one or more of the partners may buy at the sale. However, this is not wrongful so long as grounds exist for the dissolution of the partnership, the judicial sale is conducted properly and the partner-purchaser is not guilty of any breach of the fiduciary duty owed to his partners. All three conditions were met here.

The judgment and orders of the circuit court of Cook County are affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.